T.C. Memo. 1999-192


UNITED STATES TAX COURT


FRANK AND VIRGINIA MUHICH, Petitioners <u>v</u>. COMMISSIONER OF
INTERNAL REVENUE, Respondent

MIDWEST PORTRAITS CORP., Petitioner <u>v</u>. COMMISSIONER OF INTERNAL
REVENUE, Respondent


Docket Nos. 21561-97, 21562-97.      Filed June 14, 1999.


<u>Jennifer Prager Sodaro</u> and <u>Joe Alfred Izen, Jr.</u>, for

petitioners.

<u>William T. Derick</u> and <u>Luanne S. DiMauro</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


LARO, <u>Judge</u>:  These cases are before the Court consolidated

for purposes of trial, briefing, and opinion.  Frank and Virginia

Muhich (the Muhichs) and Midwest Portraits Corp. (Midwest)

separately petitioned the Court to redetermine respondent's

determinations of the following deficiencies and accuracy-related penalties under section 6662(a):

Frank and Virginia Muhich, docket No. 21561-97

| Year | Deficiency | Penalty Sec. 6662(a) |
|------|-----------|----------------------|
| 1994 | $18,164 | $3,633 |
| 1995 | 21,885 | 4,377 |

Midwest Portraits Corp., docket No. 21562-97

| Year Ended | Deficiency | Penalty Sec. 6662(a) |
|------------|-----------|----------------------|
| June 30, 1994 | $15,075 | $3,015 |
| June 30, 1995 | 26,090 | 5,218 |
| June 30, 1996 | 40,137 | 8,027 |

We must decide the following issues:

1. Whether the trusts implemented and used by the Muhichs during 1994 and 1995 should be disregarded for tax purposes because the trusts lacked economic substance. We hold they should.[1]

2. Whether the Muhichs' 1994 and 1995 gross income includes compensation paid by Midwest in the amounts of $112,820 and $130,193, respectively. We hold it does.

_____

[1] Respondent also raises the alternative argument that petitioners are taxable on trust income because the trusts were "grantor trusts". Given our holding that the trusts are shams, we need not and do not reach this issue.

3.  Whether section 162 allows Midwest to deduct payments to a trust promoter in the amounts of $12,000 and $5,500 for 1994 and 1996, respectively.  We hold it does not.

4.  Whether section 162 allows Midwest to deduct payments to the trusts in the amounts of $60,000, $103,238, and $132,766 for 1994, 1995, and 1996, respectively.  We hold it does.

5.  Whether the Muhichs are liable for accuracy-related penalties under section 6662(a) and (b)(1) for 1994 and 1995.  We hold they are.

6.  Whether Midwest is liable for accuracy-related penalties under section 6662(a) and (b)(2) for 1994, 1995, and 1996.  We hold it is to the extent discussed herein.

7.  Whether the Muhichs are liable for a penalty under section 6673(a)(1).  We hold they are not.[2]

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts and exhibits submitted therewith are incorporated herein by this reference.  The Muhichs resided in Mahomet, Illinois, when they petitioned the Court.  Midwest had its principal place of business in Mahomet, Illinois, when it petitioned the Court.

---

[2] Rule references are to the Tax Court Rules of Practice and Procedure.  Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years at issue.

Petitioner[3] attended 3 years of college but did not obtain a degree. From 1978 through the years in issue, petitioner owned, operated, and was the president of Midwest. Midwest was a photography business, and it earned income by participating in fund-raising programs of local community service organizations.

From 1985 forward, Midwest worked exclusively with fire, rescue, and ambulance departments in the four-State region of Illinois, Iowa, Wisconsin, and Indiana. In addition to taking the photographs, Midwest supplied the various departments with professionals to assist in soliciting donations and handing out complimentary certificates. Under this arrangement, Midwest received approximately 50 percent of the donations plus the income from the sales of additional photographs. Midwest conducted its business in the four-State region by employing "road people" to solicit donations, take the complimentary photographs, and sell additional photographs. Midwest employed two people in its home office.

Before the subject years, petitioner drew a salary from Midwest for the work he performed. Midwest deducted his salary as officer compensation. Petitioner essentially compensated himself on a commission basis, setting his salary upon Midwest's

---

[3]References to petitioner are to Frank Muhich.

financial performance.  Petitioner had a wide variety of duties including serving as Midwest's president and salesman.

Kim and Denise Martin (Martins) are certified public accountants and have been petitioners' tax advisers since 1982. The Martins prepared all of petitioners' tax returns from 1982 to date, and the Martins maintained petitioners' books and records for each of the subject years.

Introduction to the Multitrust Scheme

In early March 1994, petitioner met with a financial planner, James Myers (Myers).  Myers was a representative of Heritage Assurance Group (Heritage), an entity that promoted multitrust schemes as a means to avoid paying taxes.  Myers introduced petitioner to Heritage's scheme, which worked generally as follows.  An individual transfers his or her assets and right to receive income to a newly created family trust in exchange for a certificate of beneficial interest (CBI).  A CBI gives the individual the right to receive any distributions that the trustee, who is the same as the transferring individual, decides to make.  The family trust pays and deducts all of the trustee's personal expenses and distributes any excess corpus to a charitable trust created under the scheme.  The individual creates other trusts to circulate funds among and between.

Myers presented petitioner with promotional materials containing flowcharts and explanations detailing the above

sequence of transactions. These materials touted the tax deductibility of all of the transferring individual's personal expenses. The materials generally claimed that the individual would pay no tax on his or her income. The materials made no mention of any nontax benefit to be gained from the trust scheme.

After meeting with Myers, the Muhichs traveled over 100 miles to the offices of Heritage. There they met with Edward Bartoli (Bartoli), an attorney who was the principal promoter of Heritage's scheme. Bartoli introduced petitioner to James Savino (Savino), a certified public accountant associated with Heritage. At or about the time of this meeting, the Muhichs submitted to Heritage a form containing their financial information and assets. On this form, they stated that their number one objective was "tax avoidance".

Creation of the Five Trusts

In May 1994, very soon after meeting with Bartoli, the Muhichs, without consulting the Martins, implemented the multi-trust scheme to avoid taxes. Petitioner caused Midwest to pay $12,000 to Heritage, and Heritage supplied petitioners with a comprehensive packet of forms and documents that could be customized to create and operate the trust scheme. Petitioners used the promotional materials presented by Myers as a model for their trust arrangement.

On May 4, 1994, the Muhichs created The Muhich Asset Management Trust (Asset Trust). Petitioner signed the trust declaration as the "investor", Bartoli signed as creator and trustee, and Ms. Muhich signed as trustee. Within days, Ms. Muhich transferred virtually all of her property to petitioner.

This property included an exhaustive list of housewares, jewelry, electronics, china, and other personalty. In turn, petitioner transferred virtually all of his property (which now included Ms. Muhich's transferred property) to the Asset Trust, including the right to receive compensation for his services.[4]

In exchange, Ms. Muhich and petitioner each received a CBI representing 50 and 40 units, respectively. Within days, Bartoli resigned as trustee, and petitioner was appointed trustee. This left the Muhichs as sole trustees and sole beneficiaries of the Asset Trust.

On May 7, 1994, the Asset Trust established the Muhich Charitable Trust (Charitable Trust).[5] The Asset Trust funded the corpus with a CBI from the Asset Trust representing 10 units of ownership. In exchange, the Asset Trust received a CBI

---

[4] For reasons that are unclear, the Muhichs did not transfer all of their significant property to the trust. As relevant here, they retained title to their residence at 1106 West Dianne and petitioner's stock in Midwest.

[5] The Charitable Trust never sought nor received tax exempt status under sec. 501(c).

representing 100 units of ownership in the Charitable Trust. The Muhichs were the trustees.

On May 15, 1994, the Asset Trust created The Muhich Business Trust (Business Trust). The Asset Trust funded the corpus with $10 in exchange for a CBI representing 100 units of ownership in the Business Trust. The Muhichs were the trustees.

On May 18, 1994, the Business Trust established The Muhich Equity Trust (Equity Trust) and The Muhich Vehicle Trust (Vehicle Trust). The Business Trust funded the corpus of each trust with $10 in exchange for a CBI from each trust representing 100 units of ownership in each. The Muhichs were the trustees.

The Muhichs listed their personal residence at 1106 West Dianne as the address for the five trusts. As sole trustees and exclusive beneficiaries of all five trusts, the Muhichs had exclusive control over the trust property. They had the right to receive distributions at their sole discretion and controlled all the bank accounts. Their ability to deal with and benefit from all trust property was as free and unrestricted as before the trusts were established.

Midwest continued to operate as a corporation and continued to conduct business the same as before the trusts were created. Petitioner's work and duties at Midwest remained the same, but he no longer took a salary from Midwest. Instead, he caused Midwest to contract with the Asset Trust for the provision of his

services.   The Asset Trust was to receive $3,000 per month, plus additional consideration based upon company performance.

Operation and Tax Reporting of the Five Trusts

Upon creation of the trusts, the Muhichs hired Aegis Co. (Aegis) to help operate them.   Aegis was affiliated with Heritage.   Regarding the Asset Trust, the Muhichs named themselves as executive trustees and executive secretaries, charging themselves with the duty to manage the trust.   In return, the Asset Trust agreed to pay the Muhichs' housing, transportation, health care, and education expenses.

The Asset Trust did not engage in the active conduct of any trade or business at any time during the years at issue.   For 1994 and 1995, the Asset Trust had approximately $114,370 and $202,242 in available funds deposited into its accounts over which the Muhich's had signatory authority.   The funds included $100,820 and $130,193 for 1994 and 1995, respectively, in "consulting fees" received by the Asset trust for the services of petitioner.   The balance of the funds for each year was composed primarily of transfers from Midwest and other trusts characterized by the Muhichs as loans, and a small amount of interest income that was payable to petitioner.

From the available funds for 1994 and 1995, the Asset Trust paid the Muhichs' housing, transportation, health care, education, and miscellaneous expenses.   These payments included:

$70,000 in construction costs, interest costs, and closing costs for their new residence at 404 North Shore Drive; all of the education costs for the Muhichs' college-aged children; utilities for the Muhichs' personal residence; personal automobile expenses of the Muhichs'; mortgage payments on the Muhichs' personal residence at 1106 West Dianne; and trustee fees to the Muhichs. In each year, the Asset Trust paid to the Charitable Trust the funds that remained after all these payments.

For 1994 and 1995, the Asset Trust filed tax returns with respondent (Forms 1041) wherein its reported income included the consulting fees paid by Midwest for petitioner's services and petitioner's interest income. After deducting therefrom the above-described personal expenses of the Muhichs and the amounts paid to the Charitable Trust, the Asset Trust reported zero taxable income in each year.[6]

The other trusts did not engage in any business activity during 1994 or 1995. The Charitable Trust distributed some money in each year to various charities. With the balance, the Charitable Trust participated in a series of circular

_____

[6] The Asset Trust did not deduct the $70,000 in construction costs. Also, the Asset Trust elected to treat a large 1995 payment to the Charitable Trust as a charitable contribution deduction on its 1994 return under sec. 642(c)(1).

transactions with the other trusts and Midwest.[7]  Throughout the 1995 year, petitioner moved funds among and between the Asset Trust, the Charitable Trust, and the Equity Trust in a circular fashion.  Petitioner labeled the movements of funds "loans" or "loan repayments".

For tax purposes, the Charitable Trust filed 1994 and 1995 returns claiming it was a nonexempt charitable trust under section 4947(a)(1), and it paid no tax for either year.

The Equity Trust, the Business Trust, and the Vehicle Trust were dormant in 1994 and 1995, and each filed 1994 and 1995 income tax returns showing no taxable income.

All of the above-described trust tax returns for 1994 were prepared by Savino.  The Martins were not aware of petitioners' participation in the trust scheme until late 1994 when they prepared Midwest's tax return for that fiscal year.  The Martins discovered that Midwest purportedly paid no wages to petitioner,

---

[7] One such series of transactions occurred on June 21, 1995, when petitioner caused Midwest to pay the Asset Trust $14,247. On that same day, all of the following occurred: (1) The Asset trust paid $14,247 by check to the Charitable Trust; (2) the Charitable Trust paid $14,247 by check to the Equity Trust; and (3) the Equity Trust paid the $14,247 by check back to the Asset Trust.  Also on June 21, 1995, petitioner repeated three more times this exact same series of movements of funds in a circular fashion in the exact same amount, $14,247.  Petitioner labeled all of these advances "loans".  Finally, petitioner caused the Asset Trust to pay back the $14,247 to Midwest by check dated June 21, 1995.

and they began inquiring.  Soon thereafter and at the request of the Muhichs, Mr. Martin attended one of Heritage's seminars. Mr. Martin left the seminar with concerns about the legitimacy of the trust scheme, and he conveyed his concerns to petitioner. Petitioner dismissed Mr. Martin's concerns and indicated he would rely on the advice given by the trust promoters.  Notwithstanding their concerns, the Martins prepared the trusts' 1995 returns. After 1995, the Martins prepared the 1996 Charitable Trust return but refused to prepare any other trust returns.

Petitioners' Tax Reporting and Respondent's Determination

Midwest

Midwest filed Federal income tax returns (Forms 1120) for its fiscal years ended June 30, 1994, 1995, and 1996.  In its 1994 return, Midwest deducted the $12,000 it paid to Bartoli in connection with setting up the multitrust system.  During the 1996 fiscal year, Midwest paid to Aegis and deducted $5,500 in fees related to administration of the trusts.

During fiscal years 1994, 1995, and 1996, Midwest paid the Asset Trust $60,000, $103,238, and $132,766, respectively, pursuant to the consulting contract.  Midwest labeled the payments "consulting fees" and deducted these amounts in its income tax returns.

By notice of deficiency dated August 6, 1997, respondent determined the above-described payments were not ordinary and

necessary business expenses under section 162 and that they were nondeductible constructive dividends. Respondent disallowed these deductions in full.

The Muhichs

The Muhichs filed Federal income tax returns for 1994 and 1995. On these returns, the Muhichs did not report any income from Midwest in the form of compensation or dividends.

By notice of deficiency dated August 6, 1997, respondent determined the trust scheme was an abusive trust arrangement which should be ignored for tax purposes. Respondent determined that petitioner received constructive dividends from Midwest in the amounts of $112,820 and $130,193 for 1994 and 1995, respectively. For 1994, the constructive dividend amount is composed of the $12,000 paid by Midwest to Bartoli and the $100,820 in fees paid by Midwest to the Asset Trust during the year. For 1995, the entire amount represents fees paid by Midwest to the Asset Trust during the year.[8]

OPINION

Economic Reality of the Trusts

We first decide whether the trusts should be disregarded for tax purposes. According to respondent, they should because they lack economic substance and are shams. We agree.

---

[8] Respondent also made smaller, miscellaneous upward and downward adjustments to the Muhichs' income in both years which flowed from his determination that the trusts should be ignored.

For all issues in this case except the penalty under section 6673, respondent's determination is presumed correct, and petitioners bear the burden of proving it wrong. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Where an entity is created that has no real economic effect and which affects no cognizable economic relationship, the substance of a transaction involving the entity will control over its form. See Zmuda v. Commissioner, 79 T.C. 714, 720 (1982), affd. 731 F.2d 1417 (9th Cir. 1984); Markosian v. Commissioner, 73 T.C. 1235, 1241 (1980). Regarding economic substance, we recently stated: "The doctrine of economic substance becomes applicable, and a judicial remedy is warranted, where a taxpayer seeks to claim tax benefits, unintended by Congress, by means of transactions that serve no economic purpose other than tax savings." ACM Partnership v. Commissioner, T.C. Memo. 1997-115, affd. in part, revd. on other grounds in part, dismissed in part and remd. in part 157 F.3d 231 (1998). We find such lack of economic purpose in this case.

More specifically, we have held a trust is not recognized for tax purposes if it has no economic substance apart from tax considerations. See Markosian v. Commissioner, supra at 1244-1245. These principles apply even though an entity may have been properly formed and may have had a separate existence under applicable local law. See Zmuda v. Commissioner, supra at 720.

When the settlor is a trustee and the beneficiaries are the settlor and his family, the trusts must be closely scrutinized for economic substance.  See Markosian v. Commissioner, supra at 1245; see also Helvering v. Clifford, 309 U.S. 331, 334 (1940).

We consider the following factors when deciding whether a trust lacks economic substance for tax purposes:  (1) Whether the taxpayer's relationship as grantor to the property differed materially before and after the trust's formation; (2) whether the trust had an independent trustee; (3) whether an economic interest passed to other beneficiaries of the trust; and (4) whether the taxpayer felt bound by any restrictions imposed by the trust itself or by the law of trusts.  See Markosian v. Commissioner, supra at 1243-1245; see also Buckmaster v. Commissioner, T.C. Memo. 1997-236.

As to the first Markosian factor, the Muhichs' relationship to their property did not differ materially before and after the formation of the trusts.  The Muhichs' personal residence was the address for all the trusts, and their personal use of their property was never restricted.  As sole trustees and sole owners of the CBI's, the Muhichs could manipulate, distribute, or otherwise use trust property at their whim.  In fact, the trust instruments gave them sole discretion to deal in trust property and make distributions.

Petitioners argue that their residence at 1106 W. Dianne and then at 404 North Shore Drive was the Asset Trust "headquarters", and, therefore, they could deduct all operational expenses connected thereto. We disagree. Petitioners' attempt to legitimize payment of their personal expenses is unavailing. In addition to the fact the trusts were not conducting a trade or business, the expenses were personal in nature which preclude their deductibility. The first factor weighs against petitioners.

As to the second Markosian factor, the trusts lacked an independent trustee. But for Bartoli's 6-day stint as trustee of the Asset Trust, the Muhichs were at all times sole trustees of all trusts. The fact that Bartoli served as trustee for a limited time is meaningless; it was a paper appointment solely for the purpose of facilitating the creation of the trust scheme. The second factor weighs against petitioners.

As to the third Markosian factor, no economic interest in the trusts ever passed to any beneficiary other than the Muhichs. The only beneficiaries were the Muhichs or other trusts they created and controlled under the trust scheme. The third factor weighs against petitioners.

As to the final Markosian factor, the Muhichs were not bound by any restriction imposed by the trusts or the law of trusts as to the use of trust property. The record demonstrates

petitioners dealt freely with trust funds and property, and they manipulated funds between the trusts in a circular and nonsensical manner. This factor weighs against petitioners.

In addition to our analysis of the Markosian factors, all of which favor respondent, other facts herein make clear that the tangled web woven by petitioners did little more than conceal the ownership of assets and disguise the true earner of income for the purpose of avoiding taxes. First, petitioners created an elaborate scheme of documents and paperwork with an eye towards creating an aura of legitimacy for the trusts. These canned documents were part of the mass-produced trust package marketed by Heritage and paid for with the $12,000 fee. Notwithstanding the Muhichs spent time filling in the blanks, these documents do not lend economic reality to the transactions they purport to memorialize, and we place no weight on them.

Second, petitioner lacked a basic understanding of the scheme's operation. He was generally unfamiliar with the intricacies and interworkings of the trust scheme, and he was unfamiliar with basic terms such as "grantor", "beneficiary", and "trust declarations". Instead of directly responding to questions asked at trial, petitioner often referred the Court to the reams of paperwork submitted into the record with the suggestion that the answers could be found somewhere in those

documents.[9]  Petitioner's inability to discuss basic trust

concepts is inconsistent with his contention that the trust

scheme was a legitimate business arrangement.[10]

In sum, petitioners established the trusts with an aim to

avoid, improperly, Federal income tax.  None of the trusts ever

reported taxable income, and none of them conducted a legitimate

business activity.  Petitioners' purpose for the trust scheme was

to take untaxed money out of Midwest and circulate it around the

trusts to pay the Muhichs' personal expenses.  The Muhichs

admitted as much at trial.  Although the Muhichs attempted to

identify other nontax reasons for the trusts, we find these

---

[9] The following colloquy between petitioner and respondent's
counsel on cross-examination exemplifies petitioner's elusiveness
and lack of knowledge as to the operation of the trust scheme:

> Q  Edward Bartoli helped set up the initial
> trust for you.  Is that right?
> A  Right.
> Q  And that would include the declarations
> for each of the trusts?
> A  I'm not that familiar with terms.  It's
> all written down. You have the trust
> documents, so whatever's in the documents is
> what we did.

[10]  We were similarly unimpressed with Ms. Muhich.  She
admitted she was only "kind of" familiar with two of the trusts
and stated that she knew more about the entire scheme after
sitting through the trial than she did before.

reasons incredible.[11]  Because the trusts lacked economic
reality, the Court will ignore them for tax purposes.[12]

Gross Income/Deductions by Midwest

We turn to the question of whether the Muhichs' gross income
includes the "consulting fees" paid by Midwest to the Asset Trust
and the $12,000 paid by Midwest to the trust promoters (issue 2).
Related thereto is the question of whether section 162 allows
Midwest to deduct these payments and the $5,500 paid to the trust
promoters in 1996 (issues 3 and 4).

As to the "consulting fees", respondent determined that
these "fees" were nondeductible constructive dividends paid to
petitioner by Midwest, and, as such, were includable in his gross
income.  Midwest contends that these "fees" are deductible by

---

[11] Petitioner, for example, testified he adopted the trust
scheme to protect Midwest and his assets.  If such was the case,
then why did the Muhichs not transfer their most significant
assets to the trusts immediately upon creation (i.e., their
various real estate holdings and the stock in Midwest)?
Moreover, Midwest was already a corporation; thus, Midwest
enjoyed the benefits of limited liability attendant to doing
business in the corporate form.

[12] Respondent does not contest petitioners' assertion that
the amounts the Charitable Trust paid to sec. 501(c)(3)
organizations are deductible by the Muhichs.  The parties shall
take these deductions into account in the Rule 155 computation.

Midwest as compensation for petitioner's services.[13]  We agree
with Midwest that the "consulting fees" are deductible
compensation for petitioner's service.  We agree with respondent
that these "fees" are includable in petitioner's gross income,
but as compensation rather than dividends.

A payment to a shareholder/employee is compensation if:  (a)
The corporation intends the payment to be solely for services
rendered by the shareholder/employee, and (b) the amount paid is
reasonable as to the services rendered.  See Electric & Neon,
Inc. v. Commissioner, 56 T.C. 1324 (1971), affd. without
published opinion 496 F.2d 876 (5th Cir. 1974); sec. 1.162-7,
Income Tax Regs.  A corporation's intent to compensate for
services is a condition precedent to the underlying payment's
deductibility, see Electric & Neon, Inc. v. Commissioner, supra,
and such an intent is determined when the payment is made, see
Paula Constr. Co. v. Commissioner, 58 T.C. 1055 (1972), affd.
without published opinion 474 F.2d 1345 (5th Cir. 1973).  An
intent to compensate is a question of fact, which in the case of
a corporation turns on the actions of the officers.  See King's
Court Mobile Home Park, Inc. v. Commissioner, 98 T.C. 511, 514
(1992).  We employ close scrutiny when a shareholder/employee

---

[13] Petitioner fails to acknowledge that if the amounts are
compensation, he must include them in income.

controls the corporation's affairs.  See <u>Paula Constr. Co. v. Commissioner</u>, <u>supra</u> at 1058.

While we held the trusts were shams and should be ignored for tax purposes, we find the consulting contract helpful for the limited purpose of determining the intent of the parties.  The contract provides that "[Midwest] desires to contract the skills and services of one Frank W. Muhich in the performance of services on behalf of [Midwest]," and we find that petitioner performed these services for Midwest during the subject years. Before the subject years, petitioner worked as a principal officer of Midwest, establishing its name recognition, overseeing its business, and playing a key role in its success.  His work-related duties did not change after the trusts were formed; he continued to own and operate Midwest exactly as before, and Midwest continued to pay compensation for his services.  We conclude Midwest paid the "consulting fees" intending to compensate petitioner for his services.  In disregarding the Asset Trust's existence for tax purposes, we view these payments received directly by petitioner, the true earner of the income.

As to reasonableness, each year petitioner based his salary upon the financial performance of Midwest.  We view this as a reasonable way for an owner of a closely held business to compensate himself or herself.  The contract in this case specifically provides for compensation of $3,000 per month, plus

additional amounts based upon Midwest's financial performance. This compensation package is very similar to the commission type arrangement used before the trust scheme. On the primary basis of the amount of compensation that Midwest paid petitioner before the subject years, the type and content of the services he performed during the subject years, and the gross receipts those services produced for Midwest, we conclude petitioner's compensation during the subject years was reasonable. We hold Midwest may deduct the "consulting fees" under section 162, and petitioner must include these fees in income in the amounts of $100,820 and $130,193 for 1994 and 1995, respectively.

We now turn to the $12,000 and $5,500 payments made by Midwest to the trust promoters in 1994 and 1996, respectively. Respondent determined these amounts were not deductible by Midwest and that the $12,000 was a constructive dividend to petitioner.[14] Petitioners contend that both amounts were deductible under section 162(a), and that the $12,000 is not includable in petitioner's income. We disagree.

A taxpayer may deduct "all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." Sec. 162. The taxpayer must show that the

---

[14] The issue of whether the $5,500 payment was includable in petitioner's gross income as a constructive dividend is not before the Court.

expenses were both ordinary and necessary.  See Northwestern Ind. Tel. Co. v. Commissioner, 127 F.3d 643, 646 (7th Cir. 1997), affg. T.C. Memo. 1996-168.  Deductions are a matter of legislative grace.  See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).

In the context of section 162, an expense is necessary if it is appropriate or helpful for the development of the taxpayer's business.  See Welch v. Helvering, 290 U.S. at 114.  An expense is ordinary if it relates to a transaction commonly or frequently occurring in the taxpayer's business community.  See  INDOPCO, Inc. v. Commissioner, supra at 85 (discussing the requirements of section 162).

It follows from our holding that the trusts were shams and should be ignored for tax purposes that the payments in pursuance of the scheme were not ordinary and necessary business expenses under section 162.  The expenses were not appropriate or helpful for the development of Midwest's photography business, nor was there any evidence they were a usual expense within Midwest's business community.  We hold the payments to the trust promoters (Bartoli and Aegis) are not deductible under section 162.

Turning to constructive dividends, taxpayers must include dividends in gross income.  See sec. 61(a)(7).  When a corporation distributes property to a shareholder as a dividend, the shareholder must include in gross income the distribution to

the extent of the corporation's earnings and profits. See secs. 301(a), (c)(1), and 316. The shareholder must do so even though the corporation has not formally declared a dividend. See United States v. Mews, 923 F.2d 67, 68 (7th Cir. 1991); Crosby v. United States, 496 F.2d 1384, 1388 (5th Cir. 1974). The shareholder need not receive the distribution directly. Payments on behalf of a shareholder are treated as if paid directly to the shareholder. See Epstein v. Commissioner, 53 T.C. 459, 474-475 (1969).

In determining whether a shareholder has received a constructive dividend, we look to whether the payment by the corporation benefited the shareholder personally rather than furthered the interest of the corporation. See Hagaman v. Commissioner, 958 F.2d 684, 690-691 (6th Cir. 1992), affg. and remanding on other grounds T.C. Memo. 1987-549; Ireland v. United States, 621 F.2d 731, 735 (5th Cir. 1980). Given our holding the trusts were shams and were created by the Muhichs to avoid taxes, we hold the $12,000 payment to the trust promoters was solely to benefit petitioner and his family personally. We hold petitioner must include the payment in his income as a constructive dividend.[15]

---

[15] Petitioners neither argued nor proved that Midwest did not have sufficient earnings and profits for us to categorize the payment as a dividend under sec. 316.

Section 6662(a)

The Muhichs

Respondent determined the Muhichs are liable for the accuracy-related penalty under section 6662(a) and (b)(1) for both years in issue.  This section imposes a penalty equal to 20 percent of the portion of an underpayment that is attributable to, among other things, negligence.  Petitioners will avoid this penalty if the record shows that they were not negligent; i.e., they made a reasonable attempt to comply with the provisions of the Internal Revenue Code, and they were not careless, reckless, or in intentional disregard of rules or regulations.  See sec. 6662(c); Accardo v. Commissioner, 942 F.2d 444, 452 (7th Cir. 1991), affg. 94 T.C. 96 (1990); Drum v. Commissioner, T.C. Memo. 1994-433, affd. without published opinion 61 F.3d 910 (9th Cir. 1995).  Negligence connotes a lack of due care or a failure to do what a reasonable and prudent person would do under the circumstances.  See Allen v. Commissioner, 92 T.C. 1 (1989), affd. 925 F.2d 348 (9th Cir. 1991); Neely v. Commissioner, 85 T.C. 934, 947 (1985).  The accuracy-related penalty of section 6662 is not applicable to any portion of an underpayment to the extent that an individual has reasonable cause for that portion and acts in good faith with respect thereto.  See sec. 6664(c)(1).  Such a determination is made by taking into account all facts and circumstances, including the experience and knowledge of the taxpayer and his or her reliance on a

professional tax adviser. See sec. 1.6664-4(b)(1), Income Tax Regs.

The Muhichs seek relief from the penalty by arguing they relied in good faith on advice from the Martins and Bartoli. Good faith reliance on the advice of counsel or a qualified accountant can, in certain circumstances, be a defense to the accuracy-related penalty for negligence. See, e.g., Ewing v. Commissioner, 91 T.C. 396, 423-424 (1988), affd. without published opinion 940 F.2d 1534 (9th Cir. 1991); Jackson v. Commissioner, 86 T.C. 492, 539-540 (1986), affd. 864 F.2d 1521 (10th Cir. 1989); Pessin v. Commissioner, 59 T.C. 473, 489 (1972); Conlorez Corp. v. Commissioner, 51 T.C. 467, 475 (1968). In those cases, the taxpayer must establish: (1) The adviser had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment. See Ellwest Stereo Theatres of Memphis, Inc. v. Commissioner, T.C. Memo. 1995-610.

The record in this case demonstrates the Muhichs did not act reasonably with respect to reporting their income for 1994 and 1995. The Muhichs' claim that they relied in good faith on the Martins for advice as to the tax treatment of the trust scheme is unsupported by the evidence. The Muhichs failed to disclose to the Martins they had purportedly divested themselves of most of

their assets and adopted the trust scheme. The Martins never advised the Muhichs about the scheme before the Muhichs entered into it. The Muhichs had all the trusts' returns for the year of inception (1994) prepared by Savino in an attempt to keep the existence of the trusts from the Martins. Although the Martins did prepare the 1995 returns for the trusts, they did so reluctantly and only after informing petitioner of their concern as to the trusts' legitimacy.

Nor are we persuaded that the Muhichs reasonably relied upon a qualified expert in the form of Bartoli. Bartoli's bias was obvious, and his ability to benefit financially by luring individuals into the scheme should have sent up a red flag. Petitioner is an experienced businessman who should have been suspicious of Bartoli's claims. Further, the record contains no evidence as to Bartoli's qualifications or expertise; he was noticeably absent from the trial, and petitioner was unable to locate him. The only information the Muhichs provided Bartoli was a list of assets and a questionnaire wherein they documented their desire to avoid taxes. We hold the Muhichs are liable for the accuracy-related penalties for negligence as determined by respondent.

Midwest

Respondent determined that Midwest is liable for the accuracy-related penalty under section 6662(a) and (b)(2) for all

years in issue. This section imposes a penalty equal to 20 percent of the portion of an underpayment that is attributable to, among other things, a substantial understatement of income tax. An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $10,000 (for corporations). See sec. 6662(d)(1). The understatement is reduced if it is based on substantial authority or is adequately disclosed on the return or in a statement attached to the return. See sec. 6662(d)(2). The reasonable cause exception under section 6664(c)(1) may also be used to avoid the penalty if proven by the taxpayer.

Midwest made no relevant disclosures on its returns. Furthermore, the record does not disclose Midwest had substantial authority for deducting the payments to the trust promoters. Accordingly, for each year that the Rule 155 computation reflects a substantial understatement within the meaning of section 6662(d)(1), Midwest will be liable for this penalty.

## Section 6673

Respondent moved the Court at the end of trial to impose a penalty under section 6673(a)(1). Respondent asserts the Muhichs' position is frivolous and groundless, and that they instituted this lawsuit primarily for delay. As relevant, section 6673(a)(1)(A) and (B) provides that the Court may impose a penalty of up to $25,000 wherever proceedings before us have

been instituted or maintained by the taxpayer primarily for delay, or wherever the taxpayer's position in a proceeding is frivolous or groundless.

We decline to impose a penalty under section 6673. Although the Muhichs' position that the trusts had economic substance was frivolous, we have rejected respondent's position the "consulting fees" were dividends, holding instead the "fees" were compensation. The Muhichs' position in this proceeding was somewhat meritorious to the extent they were defending against respondent's determination of constructive dividends. We admonish the Muhichs that we shall not be inclined to exercise our discretion under section 6673 so favorably in the future if presented with similar arguments by them, and we may impose a penalty.

In reaching all our holdings herein, we have considered each argument made by the parties, and, to the extent not discussed above, find those arguments to be irrelevant or without merit. To reflect the foregoing,

> An appropriate order will be issued denying respondent's motion to impose a penalty under section 6673(a)(1), and decisions will be entered under Rule 155.