T.C. Memo. 2015-4

UNITED STATES TAX COURT

KENNISON L. WAKEFIELD AND MARY L. WAKEFIELD, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 15383-09.                          Filed January 7, 2015.

R determined deficiencies in income tax for Ps' 2002, 2003, and
2004 taxable years arising from Ps' failure to report income they
received in connection with an ESOP and an S corporation, R's
disallowance of deductions for passthrough losses from Ps' wholly
owned partnership, and related computational adjustments. Before
trial the parties settled outstanding issues other than Ps' entitlement to
deductions for passthrough losses from their partnership, and they
agreed to try the case as if Ps had directly claimed on their individual
returns the deductions underlying the passthrough losses.

<u>Held</u>: The stipulation of settled issues does not authorize Ps to
deduct expenses reported by the S corporation and a related C
corporation or a $100,000 passthrough loss for 2002 from the
partnership.

<u>Held</u>, <u>further</u>, R properly disallowed all deductions for
passthrough losses from the partnership for 2002, 2003, and 2004.

[*2]     Held, further, Ps failed to substantiate most of the expenses underlying the partnership's losses for 2002, 2003, and 2004, and those expenses are therefore not deductible.  Ps may deduct expenses as conceded by R and certain expenses that have been adequately substantiated.

Held, further, Ps are liable for penalties under I.R.C. sec. 6662(a) as to any underpayments resulting from R's disallowance of deductions for passthrough losses from the partnership, to the extent Ps may not deduct the underlying expenses directly.

Steven R. Mather, for petitioners.

Halvor R. Melom, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WHERRY, Judge:  Respondent determined deficiencies and penalties for 2002, 2003, and 2004, as follows:

| Year | Deficiency | Penalty sec. 6662(a) |
|------|-----------|----------------------|
| 2002 | $355,871 | $71,174.20 |
| 2003 | 47,901 | 9,580.20 |
| 2004 | 21,289 | 4,257.80 |

After filing of a stipulation of facts, a supplemental stipulation of facts, a stipulation of settled issues (SOSI), and a stipulation, the facts of which are agreed

**[*3]** to by the parties and by this reference incorporated herein, as well as subsequent concessions, the issues remaining for decision are:

(1) whether the SOSI authorizes petitioners to deduct: (a) expenses and/or losses reported by corporate entities Capital Equity Resources, Inc. (Capital Equity), and/or Great Western Sierra Holdings, Inc. (Great Western), for 2002 and 2003; and/or (b) a $100,000 passthrough loss from their wholly owned general partnership Wakefield Business Enterprises Partnership (WBE) for 2002;

(2) whether petitioners may otherwise deduct passthrough losses from WBE of $161,085, $46,433, and $57,464 for tax years 2002, 2003, and 2004, respectively;

(3) whether petitioners may alternatively deduct any or all expenses reported by WBE for tax years 2002, 2003, and 2004 on Schedules A, Itemized Deductions, for those tax years; and

(4) whether petitioners are liable for section 6662(a) accuracy-related penalties for tax years 2002, 2003, and 2004 with respect to any deficiencies resulting from the disallowance of deductions for passthrough losses from WBE, to the extent they may not directly deduct the expenses underlying those losses.[1]

---

[1]All section references are to the Internal Revenue Code of 1986, as amended and in effect for the years at issue, and all Rule references are to the Tax

(continued...)

- 4 -

FINDINGS OF FACT

<u>Petitioners</u>

Petitioners Kennison and Mary Wakefield filed a Form 1040, U.S. Individual Income Tax Return, for each of the tax years 2002, 2003, and 2004 as married persons filing jointly. Petitioners lived in California when they filed their petition.

At all times during 2002 through 2004 Mr. Wakefield worked as a stockbroker. He did so as an employee, first of Prudential Financial and then of Wachovia after it acquired Prudential Financial.[2] Mr. Wakefield received a small salary from Prudential, but his earnings derived principally from commissions on investment products purchased by clients whose business he brought to the firm. Before joining the securities industry Mr. Wakefield earned a degree in business administration and marketing at the University of Southern California (USC) and attended two years of law school at the University of San Fernando Valley. As of 2002 he had 30 years of experience in the securities industry.

---

[1](...continued)
Court Rules of Practice and Procedure, unless otherwise indicated.

[2]Following the parties' lead, we disregard the ownership change and refer to Mr. Wakefield's employer simply as Prudential. Wachovia itself was subsequently acquired by Wells Fargo.

[*5]   On petitioners' tax returns for 2002, 2003, and 2004 Mrs. Wakefield reported her occupation as "interior design" and reported income and expenses from a residential building refurbishment business on attached Schedules C, Profit or Loss From Business.  In 2002 she also received wage income from Ralph's Grocery Co.

Business Entities

Before 2002 Mr. Wakefield met A. Blair Stover, Jr., a principal at the accounting firm Grant Thornton, which had been providing accounting services to petitioners.[3]  After reviewing Mr. Wakefield's financial situation, Mr. Stover recommended that Mr. Wakefield form various business entities, including Nevada corporations and an ESOP.  Mr. Wakefield engaged Grant Thornton to form the entities for him because he understood that doing so "would help * * * [him] in * * * [his] taxes as far as what * * * [his] tax obligations would be."

Mr. Stover and his team formed the following entities (business entities) for Mr. Wakefield:  (1) Great Western, an S corporation that reported Mr. Wakefield

---

[3]Mr. Stover's inappropriate, unlawful Federal and State income tax schemes involving Roth individual retirement accounts and employee stock option plans (ESOPs) are well known by this Court.  See, e.g., Paschall v. Commissioner, 137 T.C. 8 (2011); Swanson v. Commissioner, T.C. Memo. 2011-156; see also United States v. Stover, 650 F.3d 1099 (8th Cir. 2011) (affirming an injunction order imposed against Mr. Stover), aff'g 731 F. Supp. 2d 877 (W.D. Mo. 2010).

[*6] as its president and an ESOP as its sole shareholder on its 2001, 2002, and 2003 tax returns; (2) Capital Equity, a C corporation with a fiscal taxable year ending on October 31 that reported Mr. Wakefield as its sole shareholder, president, or owner on its 2002 and 2003 tax returns; and (3) WBE, a 50-50 partnership between petitioners of which Mr. Wakefield served as the designated tax matters partner.

Forming these entities enabled petitioners to participate in a management S corporation/ESOP transaction designed to reduce ordinary taxable income by the alleged payment to a newly created S corporation, Great Western, of alleged management fees that were reported by Great Western as income and passed through to the tax-exempt ESOP. The transaction also involved purported fee payments and expenses allocated between Capital Equity and WBE. In 2010 Mr. Stover was permanently enjoined from promoting various tax-shelter schemes, including the "ESOP/S" and "parallel C" structures. See supra note 3.

When Mr. Stover and several other individuals, including Angela Parker and Kelly Webb, decamped from Grant Thornton to another accounting firm, Kruse Mennillo, LLP (Kruse Menillo), Mr. Wakefield followed them and thereafter used Kruse Mennillo for tax preparation and other services. Ms. Parker and/or Ms. Webb prepared petitioners' and the business entities' tax returns for

**[*7]** 2002, 2003, and 2004. They prepared the returns using business and personal expense summaries that Mr. Wakefield created. Mr. Wakefield signed the returns as presented to him by Kruse Mennillo.

Petitioners claimed deductions for passthrough losses from WBE on Schedules E, Supplemental Income and Loss, of their 2002 through 2004 tax returns. WBE reported income, deductions, and ordinary losses on Forms 1065, U.S. Return of Partnership Income, for tax years 2002, 2003, and 2004.[4] WBE conducted no business activity and incurred no expenses during those tax years.[5]

The Notice of Deficiency

Respondent mailed a notice of deficiency to petitioners on March 23, 2009. On an enclosed Form 5278, Statement - Income Tax Changes, respondent identified the following adjustments to petitioners' income for tax years 2002, 2003, and 2004:

---

[4]For each of those tax years, WBE did not elect and was not otherwise subject to the consolidated audit provisions of secs. 6221 through 6233.

[5]As we explain below, petitioners contend that Mr. Wakefield actually incurred and paid the expenses that WBE reported on its returns (WBE expenses) in connection with his employment as a stockbroker. Petitioners represent that the same is true of the expenses that Capital Equity and Great Western reported.

| [*8] Adjustment Source | 2002 | 2003 | 2004 |
|---|---|---|---|
| (1) Other income | $270,000 | --- | --- |
| (2) Tax benefit from ESOP | 29,800 | $98,000 | --- |
| (3) Recapture of ESOP tax benefit | 450,686 | --- | --- |
| (4) Passthrough losses from WBE | 161,085 | 46,433 | $57,464 |
| (5) Itemized deductions | 27,347 | 4,333 | 1,724 |
| (6) Exemptions | 5,280 | 5,490 | --- |
| Total adjustments | 944,198 | 154,256 | 59,188 |

The notice also determined section 6662(a) penalties with respect to the resulting deficiencies. Petitioners petitioned this Court on June 22, 2009, disputing the deficiencies and their liability for the penalties.

Settled Issues and Concessions

In the SOSI filed April 16, 2012, the parties intended to settle all issues related to petitioners' participation in the management S corporation/ESOP transaction in taxable years 2001, 2002, and 2003 by attributing to them individually the taxable income that Great Western reported as having passed through to the ESOP. The SOSI thus resolved adjustments (1) through (3) above by providing that "petitioners received, but did not report, ordinary income" of

[*9] $426,313 for 2002 and $84,837 for 2003.  The amount petitioners were obliged to report for 2002, $426,313, represents the net amount of taxable income they avoided reporting for taxable years 2001 and 2002 because of their use of Great Western in conjunction with the ESOP.  The amount petitioners were obliged to report for 2003, $84,837, represents the amount of taxable income petitioners avoided reporting for taxable year 2003 because of their use of Great Western in conjunction with the ESOP.  Respondent, in turn, conceded the deficiencies he had determined with respect to Capital Equity and Great Western.

The parties further agreed in the SOSI that petitioners are liable for accuracy-related penalties under section 6662(a) equal to 10% of $190 of unreported income for 2002 and 10% of $84,837 of unreported income for 2003.  The SOSI identified two issues as outstanding:  petitioners' entitlement to deductions for passthrough losses from WBE for all three tax years at issue and their liability for section 6662(a) penalties with respect to any underpayments resulting from the disallowance, if any, of deductions for those losses.[6]

At trial the parties further refined the disputed issues through an oral stipulation.  Because WBE had conducted no activity and had neither incurred nor

---

[6]The parties characterized all remaining issues as purely computational.  We agree.

[*10] paid the WBE expenses, the parties agreed to treat the WBE expenses as having been reported directly by petitioners on their Forms 1040.  The principal issue left for trial was whether petitioners could properly deduct the WBE expenses as unreimbursable business expenses incurred in connection with Mr. Wakefield's stockbrokerage job.

The WBE expenses consisted of the following:

| Expense category | 2002 | 2003 | 2004 |
|---|---|---|---|
| Repairs & maintenance | --- | --- | $649 |
| Rent | --- | $1,362 | 3,600 |
| Interest | $18,083 | 15,070 | 20,093 |
| Other expenses | 163,002 | 128,001 | 33,122 |
| | | | |
| Other expenses detailed[1] | | | |
| Admin. fee | 120,000 | Unknown | --- |
| Travel | 1,574 | Unknown | 2,322 |
| Auto | 4,246 | Unknown | 5,539 |
| Dues & publ'ns | 193 | Unknown | 1,116 |
| Legal & prof'l fees | 4,060 | Unknown | 3,850 |
| Promos, mtgs, & seminars | 12,573 | Unknown | 7,544 |
| Parking | 1,109 | Unknown | --- |
| Telephone & Internet servs. | 1,105 | Unknown | 1,354 |
| Marketing | 6,302 | Unknown | --- |

| | | | | |
|---|---|---|---|---|
| **[*11]** Office expense | | 313 | Unknown | --- |
| Contract labor | | 3,436 | Unknown | --- |
| Meals & entertainment | | 8,091 | Unknown | 11,397 |

[1]Petitioners did not supply WBE's 2003 Federal income tax return, and respondent was able to retrieve only the return transcript for that year; thus, WBE's tax return for that year and the accompanying schedules explaining its claimed deductions are not in the record. Because we lack sufficient evidence to determine the sources to which WBE attributed its $128,001 of "Other Deductions" on its 2003 return, we list these values as "Unknown".

At trial respondent conceded that the following components of the WBE expenses (conceded expenses)[7] were ordinary and necessary business expenses and had been adequately substantiated:

| Expense | Category | 2002 | 2003 | 2004 |
|---|---|---|---|---|
| Franklin Covey | Dues & publ'ns | --- | $106.06 | --- |
| The Chartist | Dues & publ'ns | --- | 175.00 | --- |
| Sales Techs. | Dues & publ'ns | $228.00 | --- | --- |
| NLH Fin. Servs. Assocs. | Legal & prof'l fees | --- | 297.00 | --- |

[7]Respondent also conceded that petitioners had adequately substantiated $300 per year of sec. 212(3) tax preparation expenses. We list here only unreimbursed employee business expenses that may be deductible under sec. 162.

| | | | | |
|---|---|---|---|---|
| **[*12]** Waterfront Hilton seminars | Promos, mtgs, & seminars | 9,180.97 | 2,411.92 | $3,852.00 |
| Nat'l Pen Co. | Promos, mtgs, & seminars | 350.28 | --- | 541.88 |
| CIS Marketing | Marketing | 5,900.33 | 5,973.04 | --- |
| HS Dent | Marketing | 531.63 | --- | --- |
| Bill Good | Marketing | 3,000.00 | --- | --- |
| Total | | 19,191.21 | 8,963.02 | 4,393.88 |

Respondent maintains that the conceded expenses may have been reimbursable and so are not properly deductible.

Prudential's Reimbursement Policy

Prudential offered reimbursement to its employees for expenses incurred in connection with the company's business, subject to an annual cap of approximately $2,000 to $2,500 during the years at issue. Mr. Wakefield typically sought reimbursement for expenses paid in cash or by check as opposed to those paid by credit card. Mr. Wakefield might possibly have received reimbursement for some of the expenses for which he and/or the business entities claimed deductions, but that is very improbable given his considerable out-of-pocket expenses and his cash and check payments.

**[*13]** <u>Petitioners' Substantiation Evidence</u>

At trial, to substantiate the expenses underlying their claimed deductions, petitioners introduced an exhibit consisting of three types of documents: (1) checking and credit card account statements reflecting payments they made in the tax years at issue; (2) handwritten expense summaries that Mr. Wakefield prepared and provided to Kruse Mennillo at the end of each relevant tax year;[8] and (3) annual spreadsheets, at least one of which was prepared by Kruse Menillo, allocating stated amounts within various expense categories among Great Western, Capital Equity, and WBE (spreadsheets).

OPINION

I.    <u>Scope of SOSI</u>

As a threshold matter, we consider whether the SOSI authorizes petitioners to deduct (1) expenses and/or losses reported by Capital Equity and/or Great Western and/or (2) a $100,000 passthrough loss from WBE for 2002. The SOSI resolved what had been the principal issues in this case and in two related cases:[9]

---

[8]Mr. Wakefield's expense summaries also bore handwritten notations from his counsel and from at least one other party, presumably someone at Kruse Mennillo.

[9]The related cases were: <u>Great W. Sierra Holdings, Inc. v. Commissioner</u>, docket No. 15443-09, and <u>Capital Equity Res., Inc. v. Commissioner</u>, docket No.

(continued...)

**[\*14]** the Great Western ESOP's ownership structure and management services.
With respect to these issues, the notice of deficiency in this case originally
determined adjustments totaling $750,486 for 2002 and $98,000 for 2003 as well
as penalties.[10]  To resolve these issues, petitioners agreed to income inclusions of
$426,313 for 2002 and $84,837 for 2003, plus specified penalties, and respondent
conceded the deficiencies he had determined with respect to Capital Equity and
Great Western and agreed that petitioners are not liable for an accuracy-related
penalty pursuant to section 6662(a) for their 2001 tax year and

---

[9](...continued)
15442-09.  In each case, shortly after the SOSI's filing, the Court entered a
stipulated decision that no deficiencies in income tax and no penalties were due
from the taxpayer corporation for the subject tax years.  See Great W. Sierra
Holdings, Inc. v. Commissioner, T.C. Dkt. No. 15443-09 (May 21, 2012); Capital
Equity Res., Inc. v. Commissioner, T.C. Dkt. No. 15442-09 (May 21, 2012).

[10]The amounts shown represent only the adjustments specifically related to
Great Western because these seem like the appropriate points of comparison for
the amounts of income petitioners agreed to include.  Omitted from these sums are
the adjustments for (1) "Losses from Wakefield Partnership", (2) itemized
deductions, and (3) exemptions.  Adjustment (1) is considered later in this opinion.
Adjustments (2) and (3) are computational.

**[\*15]** are liable only for a 10% penalty for 2002 and 2003.[11] The parties now dispute whether this agreement incorporated additional, implied terms.[12]

A. Construing the SOSI

As its name implies, the SOSI embodies a partial settlement agreement. The parties' disparate interpretations of that agreement compel us to examine whether it constitutes a valid settlement, and if so, what its terms are. These two inquiries collapse into one. "'A settlement is a contract and, consequently, general principles of contract law determine whether a settlement has been reached.'" See Dorchester Indus., Inc. v. Commissioner, 108 T.C. 320, 330 (1997) (quoting

---

[11]Although petitioners' 2001 tax year is not presently before the Court, the parties have stipulated that their agreement included this concession by respondent. We note it for completeness.

[12]Petitioners have not argued that the SOSI is not a valid and enforceable settlement agreement, but their expansive interpretation of the SOSI's language suggests that they may have been mistaken as to its scope. As with a contract, however, a unilateral mistake generally will not justify relief from an otherwise valid stipulation. See Dorchester Indus. Inc. v. Commissioner, 108 T.C. 320, 330 (1997) (explaining that "'[t]his Court has declined to set aside a settlement' [agreement]" absent fraud or mutual mistake (quoting Manko v. Commissioner, T.C. Memo. 1995-10)), aff'd without published opinion, 208 F.3d 205 (3d Cir. 2000). Nor will it support adoption of the mistaken party's interpretation. See Korangy v. Commissioner, T.C. Memo. 1989-2, 56 T.C.M. (CCH) 989, 991 (1989) ("'If the mistake of one party to a written instrument is in thinking that it contains a larger promise by the other party than in fact it does, and the other party has no reason to know of this mistake, of course the mistaken party cannot hold the other to the large promise that he did not make[.]'" (quoting 3 Corbin on Contracts, sec. 608 (1960))), aff'd, 893 F.2d 69 (4th Cir. 1990).

**[\*16]** <u>Manko v. Commissioner</u>, T.C. Memo. 1995-10), <u>aff'd without published opinion</u>, 208 F.3d 205 (3d Cir. 2000).  To form a contract, parties must objectively manifest their mutual assent to its essential terms.  <u>Id.</u>  The SOSI, which counsel for both parties signed, could itself satisfy this requirement provided that it delineates the agreement's essential terms in a manner sufficiently unambiguous as to demonstrate mutual assent.  We conclude that it does.

In construing a settlement agreement, we again look to contract law.  <u>See</u> <u>Rink v. Commissioner</u>, 100 T.C. 319, 325 (1993) (applying this rule in the context of a closing agreement), <u>aff'd</u>, 47 F.3d 168 (6th Cir. 1995); <u>see also</u> <u>Stamos v. Commissioner</u>, 87 T.C. 1451, 1455 (1986) (construing stipulation in accordance with contract law principles); <u>Cung v. Commissioner</u>, T.C. Memo. 2013-81, at \*6, (construing stipulation of settled issues in accordance with contract law principles).  If an agreement is ambiguous, we may examine extrinsic evidence to determine the intent of the parties.  <u>See</u> <u>Woods v. Commissioner</u>, 92 T.C. 776, 780 (1989) (stating this rule in the context of an agreement to extend the period of limitations).  But in construing an agreement and ascertaining the parties' intent, we look first within the agreement's four corners.  <u>Rink v. Commissioner</u>, 100 T.C. at 325.  Here, we need not look beyond them.

[*17] The parties focus on the following portion of the SOSI:

1. In the Notice of Deficiency, respondent determined petitioners had unreported income during the years, in the amounts, and due to the issues shown in the following table:

| Year | Issue | Amount |
|------|-------|--------|
| 2002 | Other Inc. | $270,000.00 |
| 2002 | Recapture of Mgt ESOP Tax Benefit | $450,686.00 |
| 2002 | Tax Benefit from Mgt. ESOP | $29,800.00 |
| 2003 | Tax Benefit from Mgt. ESOP | $98,000.00 |

In resolution of these adjustments, the parties agree petitioners received, but did not report, ordinary income during the years and in the amounts shown in the following table:

| Year | Amount |
|------|--------|
| 2002 | $426,313.00 |
| 2003 | $84,837.00 |

Petitioners contend that: (1) the amounts they must include in income pursuant to the foregoing paragraph represent gross income that Great Western reported for these tax years; and (2) for each of the tax years at issue, Kruse Menillo divvied up Mr. Wakefield's business expenses among the business entities and reported some of those expenses on each entity's return. On these premises, petitioners reason that the SOSI's first paragraph contemplates their

[*18] deduction of Mr. Wakefield's business expenses allocated to and reported by Capital Equity and/or Great Western, subject to substantiation requirements.

Petitioners further attempt to reconstruct the complex, multiyear deferral scheme that Mr. Stover implemented on their behalf, and they trace various claimed expenses and other tax benefits through this structure. They contend that, on the business entities' returns, Kruse Menillo reported income and corresponding deductions for payments between the entities. Petitioners reason that the SOSI's first paragraph contemplates their deduction of one interentity payment in the net amount of $100,000, deducted on WBE's 2002 return, that generated the income they must include for 2003.

Respondent disputes petitioners' interpretation of the SOSI. He answers that: the SOSI does not, on its face, authorize petitioners to deduct any expenses or losses; respondent never understood the SOSI to authorize petitioners' proposed additional deductions; petitioners' elaborate theory for how the scheme operated relies on unsupported speculation; and "an amount of income reported on one tax return [does not] necessarily require[] a corresponding deduction on another tax return."

We agree with respondent's narrower reading of the SOSI's first paragraph as it relates to deductions for business expenses that Capital Equity and/or Great

[*19] Western reported. On its face, the SOSI does not provide for such deductions. It does not associate the required income inclusions with Great Western but instead simply lists dollar amounts without identifying their source. It omits any reference to either Great Western or Capital Equity. Its first paragraph expressly requires only specified income inclusions without alluding to any corresponding deductions.

The parties did, however, affirmatively address deductions elsewhere in their agreement. The SOSI's third paragraph specifically identifies petitioners' entitlement to deduct passthrough losses from WBE as an unresolved issue. It states:

> 3. The following issues set forth in the Notice of Deficiency remain outstanding:

| Year | Issue |
|------|-------|
| 2002, 2003, 2004 | Losses from Wakefield Partnership |
| 2002, 2003, 2004 | I.R.C. § 6662(a) Penalty based on "Losses from Wakefield Partnership" |

Plainly, the parties did consider petitioners' entitlement to deductions when they drafted the SOSI. They expressly addressed petitioners' entitlement to deductions that WBE reported, but not deductions that Great Western and Capital Equity

[*20] reported.  Had the parties contemplated affording petitioners such deductions, we think they would have done so explicitly in the SOSI.  The SOSI's third paragraph thus suggests that the parties did not contemplate the SOSI would allow petitioners to deduct expenses that Capital Equity and Great Western reported.

That paragraph also resolves petitioners' contention regarding deduction of a $100,000 loss from WBE for 2002.  The absence of any limitation or qualification on the phrase "Losses from Wakefield Partnership" makes plain that the SOSI neither authorizes nor forecloses petitioners' deduction of $100,000 of the net loss that WBE reported for 2002.  Like the balance of WBE's reported net loss for that year, the parties expressly designated it an open question.

We conclude that the SOSI unambiguously (1) does not permit petitioners to deduct expenses exceeding those reported on WBE's returns and (2) leaves open whether they may deduct $100,000 of "loss" reported by WBE.[13]

_____

[13]Even if the SOSI itself were ambiguous, the most credible available extrinsic evidence supports the foregoing conclusions.  Because neither party had addressed on brief petitioners' legal basis (other than the SOSI), if any, for deducting the $100,000 passthrough loss from WBE for 2002, we sought supplemental briefing on this issue.  See order of July 1, 2014.  To facilitate our proper resolution of that issue, we also asked the parties to stipulate if possible, or to otherwise brief, the source of and factual and/or legal basis for the income inclusions that the SOSI required.  See id.  In response to the latter directive, the

(continued...)

**[\*21]** B.     Modifying the SOSI

We have concluded that the SOSI does not authorize petitioners to deduct a $100,000 passthrough "loss" from WBE. Ordinarily, this would mean that petitioners may deduct the loss only if and to the extent that it is allowable absent the SOSI--e.g., if it represents an ordinary and necessary business expense deductible under section 162. Because petitioners' arguments concerning this loss could be construed as a request to modify or for relief from the SOSI under Rule 91(e), however, we first ask whether we should modify the SOSI to align with their interpretation.

Stipulations should be enforced according to their terms "unless manifest injustice would result." Bail Bonds by Marvin Nelson, Inc. v. Commissioner, 820 F.2d 1543, 1547 (9th Cir. 1987), aff'g T.C. Memo. 1986-23. In exceptional circumstances, however, we may permit a party to qualify, change, or contradict a

---

[13](...continued)
parties stipulated that the required income inclusions represent "the amount of taxable income petitioners avoided reporting" for tax years 2001 through 2003 because of their use of the management S corporation/ESOP structure. Taxable income is defined in the Code. Sec. 63 generally defines taxable income as gross income less allowable deductions. The parties' chosen language thus indicates that the income inclusions that the SOSI required have already been netted against any allowable deductions that Great Western reported. Although this stipulation was not executed contemporaneously with the SOSI, it is the only relevant and credible extrinsic evidence in the record of the parties' intent. Thus, looking to extrinsic evidence would not alter our conclusion on this point.

**[\*22]** stipulation "where justice requires", Rule 91(e), or if "good cause is shown", Saigh v. Commissioner, 26 T.C. 171, 176 (1956).

In deciding whether to allow a party to modify a stipulation, we consider various factors including, as relevant here, possible injustice to the moving party if the stipulation were enforced. Dorchester Indus. Inc. v. Commissioner, 108 T.C. at 334-335 (citing Adams v. Commissioner, 85 T.C. 359, 375 (1985)). In that vein, petitioners protest that unless their interpretation of the SOSI prevails, they will be denied the same tax benefit twice. To evaluate this claim, the Court has closely examined the tax returns for WBE, Capital Equity, and Great Western in the record. The parties have stipulated that Great Western was the S corporation in a management S corporation/ESOP structure that Mr. Stover promoted. The items of income, deduction, and loss reported on those returns align with the income flows in the "parallel C" and "ESOP/S" structures that Mr. Stover sold to other clients contemporaneously with his services to petitioners. See United States v. Stover, 731 F. Supp. 2d 887, 891-892, 895-896 (W.D. Mo. 2010), aff'd, 650 F.3d 1099 (8th Cir. 2011).

Greatly simplified, these structures routed fictional, purportedly deductible payments among various entities with different tax years in a shell game designed to generate paper losses while minimizing net taxable income left in any taxable

[*23] entity for any tax year.[14]  See id.  Here, WBE, a passthrough entity, reported

a net loss for its tax year ending December 31, 2002.  It did so in part by deducting

a $120,000 "ADMINISTRATION FEE" allegedly paid or accrued in that year.

Capital Equity, a C corporation, reported $120,000 of gross receipts for its

overlapping tax year ending October 31, 2003.  Capital Equity reported negative

taxable income of $1,337 for that tax period, due in part to a $98,000 deduction

for commissions accrued or paid that was reported on page 1 of the tax return

under "Cost of goods sold".  For its tax year ending December 31, 2003, WBE

reported gross receipts of $98,000.  It ultimately reported negative taxable income

of $46,433 for that year, due primarily to $128,001 of claimed other deductions.

According to one of petitioners' spreadsheets, these other deductions consisted of

---

[14]In the parallel C structure, an S corporation would zero out its operating income with deductions for fictitious service fees paid at yearend to a sham corporation with a tax year ending November 30 or earlier, thereby achieving up to 11 months' deferral for the S corporation shareholder.  See United States v. Stover, 731 F. Supp. 2d at 891-892.  In the ESOP/S structure, the sham management company would elect S corporation status, and an ESOP (with the operating company's individual owner as sole beneficiary) would be organized as its sole shareholder, thereby achieving indefinite deferral.  See id. at 895-896.  The structure Mr. Stover created for petitioners involved a C corporation and an S corporation owned by an ESOP.  However, nothing in the record indicates that there was ever a second S corporation or any other entity engaged in business operations during the tax years at issue.  WBE appears to have filled the operating entity role, but its deductions served to generate net ordinary losses that would pass through and offset Mr. Wakefield's employment income rather than to offset operating income of the partnership itself.

[*24] $30,001 of various itemized business expenses[15] plus a $98,000 administrative fee paid to Great Western, an S corporation. Great Western did, indeed, report $98,000 of gross receipts for that same tax year, with deductions reducing its reported net ordinary income to $84,837.

No evidence in the record indicates that any services were ever rendered by any of the business entities, nor that any of these reported payments were actually made. Rather, the evidence in the record strongly suggests that this entire series of transactions was a sham. See, e.g., Paschall v. Commissioner, 137 T.C. 8, 19 (2011) (observing, in a case involving another Stover-created avoidance scheme, that "[w]here a series of transactions, taken as a whole, shows either that the transactions themselves are shams or that the transactions have no 'purpose, substance, or utility apart from their anticipated tax consequences', the transactions are nullified and not recognized" (quoting Goldstein v. Commissioner, 364 F.2d 734, 740 (2d Cir. 1966), aff'g 44 T.C. 284 (1965))).

The SOSI, however, appears to respect these transactions as genuine for tax purposes. More specifically, the SOSI treats Great Western's reported gross

---

[15]Exhibit 8-J at Bates page 000193 indicates that only the statutorily permitted 50% of the $15,557 of meals and entertainment expenses, $7,779, was included in the $30,001. See sec. 274(n). Interest and rent were deducted separately on the income tax return.

[*25] receipts for 2003, representing the last in the series of apparently sham payments, as real, taxable income, not simply a book entry devoid of economic substance. Petitioners contend that the entire series of payments must be respected. Each item of income should correspond to an expense, and vice versa. Consequently, the first fee payment in the series--$120,000 by WBE in 2002-- should be respected as a genuine expense. Because WBE also reported $20,000 in gross receipts for that year, the net loss would be $100,000, a deduction for which would pass through to petitioners. They advocate reading the SOSI to include these implied terms.

Petitioners' logic does not support modification of or relief from the SOSI under Rule 91(e) and our caselaw. The SOSI, by providing for income without corresponding deductions, is arguably at odds with the facts gleaned from examining the business entities' returns, and in Jasionowski v. Commissioner, 66 T.C. 312, 318 (1976), we continued our long-followed tradition of approving modification of a stipulation of fact to conform it to evidence adduced at trial. Yet the SOSI is a settlement agreement, not a pretrial stipulation of fact, and we apply "more stringent standards" in determining whether to disturb such an agreement. See Stamm Int'l Corp. v. Commissioner, 90 T.C. 315, 321 (1988).

**[\*26]** We regard settlement stipulations as contracts and thus typically require proof of a contractual defense before declining to enforce them. When, as here, enforcement first comes into question at the posttrial brief stage, we have been especially reluctant to grant relief. See La. Land & Exploration Co. v. Commissioner, 90 T.C. 630, 649 (1988). This reluctance only increases where the party seeking relief was represented by counsel, and the settlement stipulation followed from extensive negotiations. See Lovenguth v. Commissioner, T.C. Memo. 2007-70, 93 T.C.M. (CCH) 1040, 1042 (2007). When the SOSI was filed, petitioners had been represented by their current counsel for at least 12 months and had been engaged in settlement negotiations with respondent for at least 9 months. They do not cite any unfair or inequitable element of the negotiation process as a basis for modifying the plain language of the SOSI. We cannot rewrite an otherwise valid settlement stipulation simply because one of the parties hopes to gain a better deal than it originally struck.

That the SOSI embodies a negotiated settlement between the parties not only weighs against modification pursuant to Rule 91(e); it also undermines the power of petitioners' reasoning. The SOSI reflects that petitioners received consideration for their additional income inclusions. In the notice of deficiency respondent determined $750,486 of unreported income for 2002 and $98,000 for

[*27] 2003. The parties resolved those adjustments by agreeing upon reduced amounts of $426,313 for 2002 and $84,837 for 2003. Reducing the amount for 2002 by an additional $100,000, as petitioners effectively urge, would seem to deprive respondent of the benefit of his bargain.

For the foregoing reasons, the Court declines to modify the SOSI and concludes that petitioners remain bound by the deal they struck with respondent. They may not, pursuant to the SOSI, claim deductions for expenses exceeding those reported on WBE's tax returns or deduct a $100,000 passthrough loss from WBE attributable to the administration fee it allegedly paid or incurred in 2002. The Court will next consider petitioners' entitlement to deduct this $100,000 loss along with their entitlement to other passthrough losses from WBE.

## II.    Deductibility of WBE Expenses as Passthrough Items

The second of the four issues presented in this case is whether petitioners may deduct passthrough losses from WBE for tax years 2002, 2003, and 2004. We hold they may not.

As a general rule, the Commissioner's determination of a taxpayer's tax liability is presumed correct, and the taxpayer bears the burden of proving that the determination is improper. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Pursuant to section 7491(a), the burden of proof as to factual matters

[*28] shifts to the Commissioner under certain circumstances.  Petitioners have neither established their compliance with section 7491(a)'s requirements nor even alleged that it applies.  Accordingly, petitioners bear the burden of proof.

WBE's tax returns for tax years 2002 through 2004 report net losses generated through deductions for rents, interest, and/or other expenses.  Petitioners have offered no evidence that they or any of the business entities ever incurred or paid any rent expense.[16]  Indeed, WBE's reported rent expense has no apparent existence beyond its tax returns.  See Seaboard Commercial Corp. v. Commissioner, 28 T.C. 1034, 1051 (1957) (noting that a taxpayer's uncorroborated income tax return, though signed under penalty of perjury, need not be accepted as proof for a claimed deduction).  Petitioners conceded at trial that WBE's reported interest expenses represented no more than book entries created by their accountants.  They further conceded that WBE had neither conducted any business with which the expenses claimed on its tax returns were associated nor actually incurred those expenses.  Rather, most of the WBE expenses allegedly represent business expenses incurred by Mr. Wakefield in

[16]In their opening brief petitioners classify their payments to Nevada Corp. Associates for 2003 and 2004 as rent.  For 2002, however, they classify the payments as professional fees, and Mr. Wakefield testified that these payments were for maintaining the corporations.

[*29] connection with his employment.  If WBE neither incurred nor paid any expenses, then it cannot have properly deducted any of the items reported on its returns.  See Welch v. Helvering, 290 U.S. at 114; cf. Lohrke v. Commissioner, 48 T.C. 679, 684-685 (1967) (summarizing cases allowing one taxpayer to deduct expenses incurred by another where the taxpayer had actually paid the other's expenses to protect the payor's business interests or reputation).  Accordingly, respondent properly disallowed all passthrough losses from WBE.

III.    Deductibility of WBE Expenses as Personal Itemized Deductions

At trial the parties agreed to treat the WBE expenses as having been reported directly by petitioners on their Forms 1040.  Hence, we turn to the third issue presented for decision:  whether and to what extent petitioners may properly deduct the WBE expenses as Schedule A itemized deductions.

A.    Applicable Law

Deductions are a matter of legislative grace, and taxpayers bear the burden of proving entitlement to any claimed deduction.  Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).  A taxpayer must identify each deduction available, show that he or she has met all requirements therefor, and keep books or records that substantiate the expenses underlying the deduction.  Sec. 6001; Roberts v. Commissioner, 62 T.C. 834, 836 (1974).  The fact that a taxpayer

[*30] claims a deduction on an income tax return is not sufficient to substantiate the underlying expense. Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979). Rather, an income tax return "is merely a statement of the * * * [taxpayer's] claim * * *; it is not presumed to be correct." Roberts v. Commissioner, 62 T.C. at 837.

Under Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930), if a taxpayer claims a deduction but cannot fully substantiate the expense underlying the deduction, the Court may generally approximate the allowable amount, bearing heavily against the taxpayer whose inexactitude in substantiating the amount of the expense is of his own making. The Court must have some basis upon which to make its estimate, however, else the allowance would amount to "unguided largesse". Williams v. United States, 245 F.2d 559, 560 (5th Cir. 1957); Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985).

If a taxpayer's records are lost or destroyed because of circumstances beyond his control, the taxpayer may instead substantiate the expenses with other credible evidence. See Malinowski v. Commissioner, 71 T.C. 1120, 1124-1125 (1979). But cf. sec. 1.274-5T(c)(5), Temporary Income Tax Regs., 50 Fed. Reg. 46022 (Nov. 6, 1985) (providing that for deductions governed by section 274, taxpayer may substantiate the deductions by a reasonable reconstruction of the expenditures or uses). Here again, although the Court generally may estimate

**[\*31]** amounts, any estimate must have a reasonable evidentiary basis.  See

Villarreal v. Commissioner, T.C. Memo. 1998-420, 76 T.C.M. (CCH) 920, 921-

922 (1998).

       1.     Sections 67 and 162

Pursuant to sections 67 and 162(a), an employee taxpayer may deduct as

miscellaneous itemized deductions all of the ordinary and necessary

unreimbursable business expenses paid or incurred during the taxable year in

carrying on the trade or business of the taxpayer's employment.[17]  Lucas v.

Commissioner, 79 T.C. 1, 6 (1982).  "To qualify as an allowable deduction under

[section] 162(a) * * * an item must (1) be 'paid or incurred during the taxable

year,' (2) be for 'carrying on any trade or business,' (3) be an 'expense,' (4) be a

'necessary' expense, and (5) be an 'ordinary' expense."  Commissioner v. Lincoln

Sav. & Loan Ass'n, 403 U.S. 345, 352 (1971).  An expense satisfies the second

element only if it is "directly connected with or pertaining to the taxpayer's trade

or business".  Sec. 1.162-1(a), Income Tax Regs.  An expense qualifies as

necessary if it is "appropriate and helpful" to the taxpayer's business, Welch v.

---

[17]Along with other miscellaneous itemized deductions, unreimbursable business expenses are subject to the 2% of adjusted gross income floor under sec. 67(a).  Sec. 1.67-1T(a)(1)(i), Temporary Income Tax Regs., 53 Fed. Reg. 9875 (Mar. 28, 1988).

**[*32]** Helvering, 290 U.S. at 113, and as ordinary if the underlying transaction is a "common or frequent occurrence in the type of business involved", see Deputy v. du Pont, 308 U.S. 488, 495 (1940). A taxpayer must establish these essential elements with credible evidence. See sec. 1.6001-1(a), Income Tax Regs.

While business expenses are generally deductible, personal, living, and family expenses are typically nondeductible. See sec. 262(a). A business expense claimed as a deduction must be incurred primarily for business rather than personal reasons. See Walliser v. Commissioner, 72 T.C. 433, 437 (1979). Where an expense exhibits both personal and business characteristics, the "test[] requires a weighing and balancing of all the facts * * * bearing in mind the precedence of section 262, which denies deductions for personal expenses, over section 162, which allows deductions for business expenses." Sharon v. Commissioner, 66 T.C. 515, 524 (1976) (citing costs of commuting and ordinary clothing as examples of expenses helpful and necessary to an individual's employment that are "essentially personal" and hence nondeductible), aff'd per curiam, 591 F.2d 1273 (9th Cir. 1978).

2.    Section 274(d)

Business expenses described in section 274 are subject to rules of substantiation that supersede the Cohan doctrine. Sanford v. Commissioner, 50

**[\*33]** T.C. 823, 827-828 (1968), aff'd per curiam, 412 F.2d 201 (2d Cir. 1969);

sec. 1.274-5T, Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985).

Section 274(d) provides that no deduction shall be allowed for, among other

things, traveling expenses, entertainment expenses, gifts, and expenses with

respect to listed property (as defined in section 280F(d)(4) and including

passenger automobiles, computer equipment, and in the years at issue and up until

2010, cellular telephones) "unless the taxpayer substantiates by adequate records

or by sufficient evidence corroborating the taxpayer's own statement": (1) the

amount of the expenditure or use; (2) the time and place of the expenditure or use,

or date and description of the gift; (3) the business purpose of the expenditure or

use; and (4) in the case of entertainment or gifts, the business relationship to the

taxpayer of the recipients or persons entertained. Sec. 274(d).

B.   Reimbursability

Before we examine Mr. Wakefield's reported business expenses in detail,

we consider whether his employer's reimbursement policy forecloses the desired

deductions. Respondent maintains that to the extent that any of the WBE expenses

were otherwise deductible under section 162 and/or section 274, they may have

been reimbursable and so may not be deducted. This position extends to the

conceded expenses (excluding tax return preparation fees).

[*34] It is well settled that an employee may not deduct otherwise valid unreimbursed business expenses if the employee is entitled to reimbursement from his or her employer for such expenditures. Orvis v. Commissioner, 788 F.2d 1406, 1408 (9th Cir. 1986), aff'g T.C. Memo. 1984-533, 48 T.C.M. (CCH) 1295 (1984); Lucas v. Commissioner, 79 T.C. at 7. Where the employer imposes a cap on the amount that it will reimburse, the employee may deduct otherwise ordinary and necessary business expenses in excess of the cap, to the extent that the expenses have not been actually reimbursed. See Noyce v. Commissioner, 97 T.C. 670, 682, 685-689 (1991); Marshall v. Commissioner, T.C. Memo. 1992-65, 63 T.C.M. (CCH) 1976, 1978-1979 (1992). An employee taxpayer bears the burden of proving that claimed business expenses were not reimbursable by his or her employer. See Christine v. Commissioner, T.C. Memo. 2010-144, 99 T.C.M. (CCH) 1591, 1593 (2010), aff'd, 475 Fed. Appx. 259 (9th Cir. 2012).

Mr. Wakefield credibly testified, in sum, that Prudential offered expense reimbursement subject to a cap of approximately $2,000 to $2,500 during the years at issue; that he typically sought reimbursement for expenses paid in cash or by check; and that he incurred at least $3,000 of cash expenses each year. He testified with certainty that WBE did not claim deductions for any of his cash expenses. Petitioners have adequately shown that Prudential would not reimburse

[*35] its employees for expenses in excess of $2,500 per year and that Mr. Wakefield incurred and sought reimbursement for at least that amount of cash expenses. Therefore, on the basis of Mr. Wakefield's credible testimony, we hold that the WBE expenses, including the conceded expenses, were not reimbursable.

### C. The WBE Expenses

We organize our evaluation of Mr. Wakefield's expense claims according to the categories defined on WBE's tax returns.

#### 1. Administration Fee

WBE deducted $120,000 for 2002 as an expense for an "administration fee".

To recap, the record reflects the following correlations among the business entities' tax returns: WBE's $120,000 administration fee deduction for its tax year ending December 31, 2002, correlates with Capital Equity's reported gross receipts of $120,000 for its overlapping tax year ending October 31, 2003. For that same tax period Capital Equity deducted $98,000 for commissions accrued or paid as "Cost of goods sold", which amount correlates with WBE's reported gross receipts of $98,000 for its tax year ending December 31, 2003. According to petitioners' evidence interpreting the summary figures on WBE's tax return transcript, for that same 2003 tax year WBE deducted as part of its claimed

[*36] $128,001 of other deductions a $98,000 administrative fee paid to Great Western. Great Western, in turn, reported $98,000 of gross receipts for that same tax year, with deductions reducing its reported net income to the $84,837 that petitioners have agreed to include for 2003 pursuant to the SOSI.

Petitioners argue that causal connections link these correlating payments, and that the $84,837 they must include in income originated with and directly corresponds to $100,000 of WBE's 2002 administration fee expense ($120,000 less WBE's $20,000 of reported gross receipts), reduced by business expenses deducted along the way. To support this theory, they point to the tax returns in the record and the spreadsheet for 2003. Respondent insists that this evidence does not suffice to prove the sources of the income and deductions on the various entities' tax returns. Moreover, as we observed supra p. 24, the record is devoid of evidence documenting that any of these payments were actually made.

The Court need not resolve these substantiation issues because petitioners' claim suffers from a more fundamental flaw. While the Court agrees that the computations should be consistent, it knows of no law permitting fictitious deductions or, for that matter, taxing fictitious income. "[A] taxpayer seeking a deduction must be able to point to an applicable statute and show that he comes within its terms." New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).

[*37] Petitioners "must show the specific authority for any deduction they claim." See Melvin v. Commissioner, T.C. Memo. 2009-199, 98 T.C.M. (CCH) 159, 160 (2009). They have not done so.

By order dated July 1, 2014, this Court specifically sought supplemental briefing on "the legal basis, if any, for deduction by the partnership and/or petitioners of an expense corresponding to the 2003 income inclusion required by the SOSI." In their brief submitted in response to that order, petitioners failed to point to any provision of the Code or any interpretive caselaw or administrative guidance that authorizes their desired deduction. Instead, they argue that disallowing their deduction of the $100,000 administration fee equates to requiring that they include, and pay tax on, fictitious income--an inequitable result.

Generally, recognition of income does not inexorably prove a corresponding deductible expense. For example, payments to a promoter in furtherance of a tax avoidance scheme constitute income to the promoter, but they are not deductible under section 162 by the payor. See Muhich v. Commissioner, T.C. Memo. 1999-192, 77 T.C.M. (CCH) 2143, 2150 (1999). Furthermore, that petitioners might otherwise be obliged to recognize phantom income does not relieve them of their obligation to identify some legal authority for the deduction, nor does it permit the

[*38] Court to manufacture such authority from whole cloth. In Melvin v. Commissioner, 98 T.C.M. (CCH) at 160-161, for example, the taxpayers had been required to include cancellation of indebtedness income from which they claimed "they received no monetary benefit" and sought to offset that "'phantom' income" by deducting a fee they paid to the agent that had negotiated the cancellation on their behalf. The taxpayers had conceded the fee was not deductible under section 162 or section 212, and we rejected the authority they proposed, section 61(a)(12), which "manifestly d[id] not provide for any kind of deduction." Id. at 160-161. Accordingly, we concluded they had failed to meet their burden of proof. Id. at 161.

Petitioners' phantom income argument amounts, in essence, to a plea for fairness. This Court strives to avoid unjust results, but "we are not a court of equity and cannot ignore the law to achieve an equitable end." Yeomans v. Commissioner, T.C. Memo. 2009-216, 98 T.C.M. (CCH) 250, 254 (2009). Moreover, the parties' recent stipulation assuages our fairness concerns. In our order of July 1, 2014, we directed the parties to stipulate if possible, or to otherwise brief, the source of and factual and/or legal basis for the income inclusions required by the SOSI. The parties stipulated that the required income inclusions represent "the amount of taxable income petitioners avoided reporting"

[*39] for tax years 2001 through 2003 because of their use of the management S corporation/ESOP structure. Taxable income is a term that is defined in the Code. Section 63 generally defines taxable income as gross income less allowable deductions. The parties' chosen language thus implies that the $84,837 of income petitioners must include for 2003 pursuant to the SOSI represents not "phantom income" but bona fide, net taxable income that petitioners received and should have reported. So interpreted, the stipulation is difficult, if not impossible, to reconcile with petitioners' theory for deducting the administration fee.

In sum, petitioners have pointed us to no legal basis for their desired deduction of $100,000 of the administration fee--the $120,000 that WBE deducted, less WBE's $20,000 of gross receipts. Consequently, they may not deduct it.

2.     Travel

WBE deducted $1,574 in travel expenses for 2002 and $2,322 for 2004. Mr. Wakefield's handwritten expense summaries for 2002 through 2004 reflect various expenditures on travel, including airline tickets, taxi and shuttle service, car rental, and tolls.[18] Petitioners' account statements for the three tax years at

---

[18]On brief petitioners characterize Mr. Wakefield's toll road expenses as "office expense" rather than travel for 2003. Because Mr. Wakefield testified that
(continued...)

[*40] issue show payments to, inter alia, airlines, a limousine service, rental car agencies, and toll lane operators.

In his testimony Mr. Wakefield emphasized that regular, personal communication with his existing clients, often face-to-face, was essential to his work as a stockbroker. This "constant contact" enabled him to secure new clients through referrals and to persuade existing clients to expand their portfolios. Mr. Wakefield further testified that, because some of his clients lived in Northern California and outside the State in Arizona and Nevada, he traveled to see them on commercial airlines, renting cars and using taxis or a shuttle service in connection with his air travel. He also drove on toll roads to visit clients.

Travel expenses fall within the ambit of section 274(d) and consequently are subject to strict substantiation requirements. Petitioners have failed to meet those requirements. Mr. Wakefield generally described his travel destinations and purpose, and petitioners' account statements include dollar amounts for expenditures of the kind claimed. But petitioners have utterly failed to substantiate, for each expenditure, the amount, "[d]ates of departure and return

---

[18](...continued)
he used toll roads when visiting clients, we analyze these payments as travel expenses. To the extent that he traveled on toll roads between his home and office, sec. 262(a) would preclude deduction of these commuting expenses. See infra part III.C.4.

[*41] * * * and number of days away from home spent on business",

"[d]estinations * * * described by name of city or town", and specific business

purpose of the travel. See sec. 1.274-5T(b)(2), 50 Fed. Reg. 46014-46015 (Nov.

6, 1985); see also Smith v. Commissioner, 80 T.C. 1165, 1171-1172 (1983)

(noting that required elements must be proven "for each separate [travel]

expenditure"). For example, petitioners' account statements confirm that they

purchased airline tickets, but those statements do not disclose which were for trips

by Mr. Wakefield to visit clients and which were for petitioners' personal travel.[19]

Nor do they reveal the dates or destinations of the underlying trips. Mr.

Wakefield's testimony offered no greater specificity.

Mr. Wakefield did testify, however, that he prepared his expense summaries

using meticulous, daily diary entries recording the details of each business

expenditure, from the subjects of luncheon conversations with clients to the

purpose and cost of publication subscriptions. Mr. Wakefield further testified that

he discarded his diaries for 2002, 2003, and 2004 within the "last few years"

before the December 2012 trial because Kruse Mennillo had advised him that he

---

[19]The Court notes that in several cases the airline charges occur in pairs, suggesting that two seats to the same destination were purchased on the same day. Notwithstanding sec. 274(d), petitioners have not carried their burden of proving that these air travel expenses were not personal. See Heineman v. Commissioner, 82 T.C. 538, 542 (1984).

[*42] was obliged to maintain tax records for no more than seven years. Petitioners first received a notice of deficiency in 2009, but at trial in 2012 Mr. Wakefield averred that he "did not know" that tax years 2002 through 2004 were under examination "until just recently." He professed no recollection of having signed documents agreeing to extend the period of limitations as to tax years 2002 through 2004.

Petitioners assert that Mr. Wakefield's discarded diaries would have supplied all of the missing details concerning his travel, and that the diaries' "inadvertent destruction" should not render the claimed expenses nondeductible. This argument will not release them from section 274(d)'s strict requirements for two, distinct reasons.

First, although section 274(d) strongly favors contemporaneously produced documentation, "[w]here the taxpayer establishes that the failure to produce adequate records is due to the loss of such records through circumstances beyond the taxpayer's control * * * the taxpayer shall have a right to substantiate a deduction by reasonable reconstruction of his expenditures or use." Sec. 1.274-5T(c)(1), (5), Temporary Income Tax Regs., 50 Fed. Reg. 46016-46017, 46022 (Nov. 6, 1985). "If no other documentation is available, we may, although we are not required to do so, accept credible testimony of a taxpayer to

[*43] substantiate a deduction." Boyd v. Commissioner, 122 T.C. 305, 320 (2004). Here, Mr. Wakefield evidently made no effort to reconstruct his discarded diaries, and his vague generalizations at trial will not suffice, especially without corroborating evidence. See Roumi v. Commissioner, T.C. Memo. 2012-2, slip op. at 8 (affirming deductions' disallowance where taxpayer claimed records satisfying section 274(d) had been destroyed by a fire but "failed to reconstruct records in any meaningful manner").

Second, Mr. Wakefield's testimony reflects that his diaries were not destroyed "due to circumstances beyond [his] control" but rather of his own volition. Cf. sec. 1.274-5T(c)(1), (5), Temporary Income Tax Regs., supra (offering as examples of circumstances beyond the taxpayer's control, "destruction by fire, flood, earthquake, or other casualty"). Although he could not recall precisely when he discarded his diaries for 2002 through 2004, he testified that he regularly retained his diaries for seven years. If so, then he would have discarded the diaries relevant here after receiving the notice of deficiency and filing his petition in this case, at which point he should have been on notice that any tax records for those years could be relevant evidence. See sec. 1.6001-1(e), Income Tax Regs. (providing that records must be retained as long as they may be material in the administration of any tax law). In their posttrial brief petitioners insist that

**[*44]** Mr. Wakefield learned that his business expenses were in dispute only while preparing for trial.[20]  "[S]tatements in briefs * * * do not constitute evidence", Rule 143(c), and cannot supplement the record, Niedringhaus v. Commissioner, 99 T.C. 202, 214 n.7 (1992).  Moreover, a volitional act performed under a mistake of fact does not equate to a circumstance beyond the taxpayer's control, particularly when the act is contrary to common sense.

Petitioners have failed to properly substantiate their claimed travel expenses; consequently, they may not deduct them.

### 3.    Meals and Entertainment

WBE deducted $8,091 in meals and entertainment (M&E) expenses for 2002 and $11,397 for 2004.  Mr. Wakefield's handwritten expense summaries for

---

[20]In their reply brief petitioners offer a slightly different story, claiming that the diaries were lost as a result of their being "essentially abandoned by their initial counsel" in this case.  They cite Prouse v. Commissioner, T.C. Memo. 1982-403, 44 T.C.M. (CCH) 497 (1982), for the proposition that a taxpayer may reconstruct records substantiating his or her sec. 274(d) expense deductions when the original records were lost after being left with a third party.  Prouse is inapposite for at least two reasons.  First, petitioners have not reconstructed Mr. Wakefield's discarded diaries.  See Roumi v. Commissioner, T.C. Memo. 2012-2, slip op. at 8.  Second, unlike Mr. Prouse, Mr. Wakefield did not leave his diaries with a trusted third party in a secure location from which they mysteriously disappeared.  See Prouse v. Commissioner, 44 T.C.M. (CCH) at 499-500.  Rather, Mr. Wakefield's testimony made clear that he personally disposed of them:  When he was first asked for them in relation to this case, he had already thrown them out.

[*45] 2002 through 2004 list numerous expenditures on allegedly business-related meals and entertainment, including a catered Christmas party for clients featuring entertainment. They also reflect payments to USC and to Balboa Yacht Club.[21] Petitioners' account statements for the three tax years at issue document payments to, inter alia, dozens of restaurants, theater and concert venues, a catering service, Balboa Yacht Club, and USC.

Mr. Wakefield credibly testified that he frequently treated both existing and prospective clients to meals, plays, concerts, and sporting events to foster these business relationships and generate referrals. He averred that the financial markets were "always" discussed at such events. Mr. Wakefield testified that the payments to USC consisted of "donations",[22] a "committee" membership fee that secured him access to event tickets and preferential seating, and tickets to sporting

---

[21]It appears from petitioners' substantiation evidence that Kruse Mennillo may have classified these expenses as promotions rather than as M&E on WBE's 2002 return. Petitioners follow this classification in their brief. Because of Mr. Wakefield's testimony concerning their nature and purpose, however, we analyze them as entertainment expenses.

[22]Petitioners have not argued that these "donations" were charitable contributions deductible under sec. 170(a), and the record does not establish that the payments qualified as such under sec. 170(c). Rather, petitioners sought to establish their "donations" as business expenses. Whether classified as entertainment expenses (as on WBE's returns) or as business-related gifts, such expenses would be subject to the heightened substantiation requirements of sec. 274(d).

[*46] events to which he brought clients. With regard to the yacht club, Mr.

Wakefield explained that he "did a lot of sailing" and that, until petitioners sold

their sailboat, these payments covered monthly slip rental and bottom cleaning for

the boat. He further testified that he took clients out for meals at the club's

restaurant.[23]

As an initial matter, notwithstanding section 274(d), petitioners have not

carried their burden of proving that the claimed M&E expenses were not personal.

See Heineman v. Commissioner, 82 T.C. 538, 542 (1984). Comparing petitioners'

account statements against Mr. Wakefield's expense summaries, for example, it

appears that he claimed as a business expense every meal that he paid for from

these accounts during the tax years at issue. Mr. Wakefield candidly

acknowledged that a few of the meals for which he claimed deductions may have

been personal for his wife and himself. And far from establishing that maintaining

a sailboat was an ordinary and necessary business expense, his testimony indicated

---

[23]Mr. Wakefield's 2002 expense summary lists 10 separate amounts for payments to Balboa Yacht Club, all but 1 of which (reflecting an apparent misreading of a 0 as a 6) correspond to charges listed on petitioners' account statements. The first eight amounts range from $541 to $690. Mr. Wakefield identified the final two amounts, $186 and $159, as payments made solely for meal charges after petitioners had sold their boat.

[*47] that he pursued sailing as a hobby and may have taken clients with him occasionally.

Moreover, like travel expenses, M&E expenses must satisfy section 274(d). See sec. 274(d)(1) and (2); sec. 1.274-5T(b)(3), Temporary Income Tax Regs., 50 Fed. Reg. 46015 (Nov. 6, 1985). And like his claimed travel expenses, Mr. Wakefield's claimed M&E expenses are not adequately substantiated. Again, one can glean the dates when petitioners incurred charges and in what amounts from their account statements. But neither these statements nor Mr. Wakefield's testimony has identified, for each expense, the date of the entertainment or meal, its location, its specific business purpose, the attendees, and the attendees' business relationships to Mr. Wakefield. See sec. 1.274-5T(b)(3)(ii)-(v), Temporary Income Tax Regs., supra. Mr. Wakefield consistently spoke only in broad terms of "clients", and his sweeping generalizations--such as that "the markets" were discussed at some point during all of the meals and entertainment events for which he claimed deductions--lacked details sufficient to establish business purpose. That Mr. Wakefield may have previously maintained adequate records but discarded them before trial will not excuse petitioners' failure to more meaningfully testify about the events or to otherwise reconstruct those records or present the requisite documentation.

[*48] The Court credits Mr. Wakefield's assertion that he often paid for clients' meals and bought them event tickets. However, even if the Court had any proper factual basis upon which to estimate petitioners' deductible M&E expenses under Cohan, because section 274(d) applies, we lack discretion to do so. See Sanford v. Commissioner, 50 T.C. at 827-828; sec. 1.274-5T(a), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985).

Hence, petitioners may not deduct any of their claimed M&E expenses.

### 4. Automobile

WBE deducted $4,246 in automobile expenses for 2002 and $5,539 for 2004. Mr. Wakefield's personal expense summary for 2002 reflects that he paid $701 for auto repair and $712 of Department of Motor Vehicles (DMV) fees and that he drove 16,417 miles. For 2003 and 2004 he listed mileage and auto expenses, including lease payments for a Mercedes, on his business expense summaries. Petitioners' account statements for the three tax years at issue reflect payments to the DMV.

Mr. Wakefield explained that he drove regularly for business, meeting with slightly more than 50% of his clients away from his office. He testified that he made approximately 200 trips per year to visit clients throughout southern

[*49] California and in Arizona. Mr. Wakefield used his personal vehicle for business travel but provided Kruse Mennillo only his total mileage driven for the year.[24]

These expenses are nondeductible in their entirety for at least two distinct reasons. First, under section 262, no portion of the cost of operating an automobile that is attributable to personal use is deductible. See Michaels v. Commissioner, 53 T.C. 269, 275 (1969). Similarly, ordinary commuting expenses are not deductible. Commissioner v. Flowers, 326 U.S. 465, 473 (1946); accord Neal v. Commissioner, 681 F.2d 1157, 1158 (9th Cir. 1982), aff'g per curiam T.C. Memo. 1981-407.

In neither his contemporaneous expense summaries nor in his testimony did Mr. Wakefield make any attempt to segregate use of his car for business purposes from use for personal purposes and commuting. Miles driven to and from the office, to personal appointments, to visit friends, and on other personal outings were simply lumped in with miles driven on client visits. Similarly, he claimed deductions for the entire cost of car repairs and DMV charges, despite the fact that

[24]Mr. Wakefield testified that his accountants discounted his mileage using a percentage which the accounting firm determined on its own and apparently assumed reflected his probable actual personal versus business mileage. Mr. Wakefield also submitted his total car repair costs as business expenses, ostensibly because Kruse Mennillo told him he could deduct them.

[*50] these expenses necessarily included a personal component. The record provides no factual basis upon which to estimate the business component of these expenses, and in any event, the Court lacks discretion to make such an estimate. See Sanford v. Commissioner, 50 T.C. at 827-828; sec. 1.274-5T(a), Temporary Income Tax Regs., supra.

Second, section 274(d)'s strict substantiation requirements apply to use of and expenses related to passenger automobiles. See sec. 280F(d)(4) (passenger automobile is listed property); Smith v. Commissioner, 80 T.C. at 1172. Section 274(d) demands proof of the date, amount, and business purpose of each use or expenditure. See sec. 1.274-5T(b)(6), Income Tax Regs., 50 Fed. Reg. 46016 (Nov. 6, 1985). Mr. Wakefield did not, for his business trips, identify miles driven to and from each destination along with the date and the business purpose, such as the name of the client whom he visited. He testified only very generally that he drove to see clients, and he did not articulate a business purpose for each of the DMV and auto repair charges he incurred and deducted. Petitioners' account statements supply only the dates and amounts of such charges.

In sum, petitioners have not adequately substantiated any of Mr. Wakefield's reported automobile expenses. Consequently, they may not deduct them.

**[*51]**      5.      <u>Dues and Publications</u>

WBE deducted $193 in expenses for dues and publications for 2002 and $1,116 for 2004. Mr. Wakefield's expense summary for 2002 reflects that he spent $322 on a subscription to the Wall Street Journal. His 2003 summary reflects dues and publications expenses for the Chartist, Franklin Covey, the Oechsli Institute, Cabot Market Letter, and the Wall Street Journal; the 2004 summary lists only "publications", apparently lumped in with tapes, seminars, etc.

Mr. Wakefield testified that the Wall Street Journal was delivered to his office and that he read it to maintain his awareness of market activity in connection with his job. Mr. Wakefield's Wall Street Journal subscription was an ordinary and necessary expense of his employment as a stockbroker and is deductible. Petitioners' checking account statement for 2002 reflects a $322.17 payment to the Wall Street Journal on April 30, 2002. Conversely, the Court has carefully reviewed petitioners' account statements (those in the record) for 2003 and 2004 and found no evidence of payments to the Wall Street Journal. We will accept Mr. Wakefield's handwritten 2003 expense summary, which lists a $375 payment for the Wall Street Journal, along with his sworn testimony, corroborated by the 2002 previous year's check, as establishing that petitioners paid $375 for the Wall Street Journal in 2003. Unlike his 2003 summary, however, Mr.

[*52] Wakefield's 2004 summary does not reflect a specific, itemized expense for the Wall Street Journal. Because petitioners have not shown or testified as to the amount, if any, that they actually paid for this newspaper in 2004, they may not deduct the alleged subscription cost for that year.

Continuing with 2003, respondent has conceded that a $175 subscription to the Chartist and payments of $106.06 to Franklin Covey for publications were ordinary and necessary business expenses that have been adequately substantiated. Petitioners' bank statement reflects two $34 (rounded) payments to the Oechsli Institute. Nothing in the record indicates what product or service was received in exchange or what business purpose this payment served; however, the Court will take judicial notice that this institute helps financial professionals. The same is true of the $99 payment for the Cabot Market Letter. Accordingly, petitioners may deduct the $68 of total payments to the Oechsli Institute and the $99 payment to Cabot Marketing for 2003.

Finally, petitioners have not identified which publications Mr. Wakefield received in 2004 or how they related to his business. These expenses may not be subject to the strict substantiation requirements of section 274(d), but section 162 requires more detail than petitioners have offered. See Commissioner v. Lincoln Sav. & Loan Ass'n, 403 U.S. at 352 (noting that to be deductible under section

[*53] 162(a), item must be, inter alia, "'paid or incurred during the taxable year'
* * * for 'carrying on any trade or business,' * * * a 'necessary' expense, and * * *
an 'ordinary' expense").

In sum, petitioners may deduct publication expenses of $193[25] for 2002 and
$542 for 2003 under section 162(a) in addition to the conceded expenses.

### 6. Legal and Professional Fees

WBE deducted $4,060 in legal and/or professional fees for 2002 and $3,850
for 2004. Mr. Wakefield's 2002 expense summary reflects that he paid $4,767 to

---

[25]WBE deducted only $193 in publication expenses for 2002. Therefore,
only $193 of petitioners' reported passthrough net loss from WBE for that year
could potentially be attributable to Mr. Wakefield's Wall Street Journal
subscription. We must accordingly cap their deduction at that amount.
Respondent has conceded that a $228 Sales Technologies newsletter subscription
Mr. Wakefield purchased in 2002 was an ordinary and necessary business expense
that has been adequately substantiated. We exclude this concession from the $193
cap because Mr. Wakefield did not classify this payment as a publication expense
on his handwritten summary for the year, and the record indicates that WBE
deducted it as a marketing expense.
We note that, under petitioners' theory, Kruse Mennillo allocated the
balance of the $322 Wall Street Journal expense for 2002 to Great Western and/or
Capital Equity. Neither entity's return has been adjusted. Hence, any 2002
publication expense allocated to and deducted by Capital Equity, a C corporation,
reduced its net taxable income for that year, and any 2002 publication expense
allocated to and deducted by Great Western, petitioners' wholly owned S
corporation, reduced the amount of income that petitioners must include for 2002
pursuant to the SOSI. See supra pp. 35-39. Hence, allowing petitioners to deduct
more than $193 here would result in a duplicative deduction.

[*54] Kruse Mennillo, $200 to Hoeppner & Associates, and $1,800 to Nevada Corporation Associates (NCA). His 2003 and 2004 summaries also reflect payments to Kruse Mennillo and NCA.

Mr. Wakefield testified that Kruse Mennillo charged him $450 for tax preparation in 2002 and that the balance paid to the firm in that year was for other services. In 2003 he again paid Kruse Mennillo for tax return preparation and other tax-related services. Mr. Wakefield stated that he paid NCA to maintain the ESOP and the business entities and that he paid the law firm Hoeppner & Associates to prepare corporate documents for Capital Equity and Great Western. Petitioners' account statements document payments to Kruse Mennillo of $450 in 2002 and $2,000 in 2003. The statements do not reflect any professional fee payments in 2004.

Respondent has conceded that petitioners may deduct a $297 payment to NLH Financial Services for 2003.[26] Respondent has also conceded that petitioners may deduct $300 of tax preparation fees for each tax year at issue as a miscellaneous itemized deduction on Schedule A. See sec. 212(3); sec. 1.212-1(a)(l), Income Tax Regs. The Court finds that petitioners have adequately

---

[26]Mr. Wakefield did not list this payment as a business expense on the summary he supplied to Kruse Mennillo for 2003, such that it could have been deducted on WBE's return.

[*55] substantiated an expense of $450 for tax return preparation for 2002. The record does not disclose how much of the $2,000 that petitioners paid to Kruse Mennillo in 2003 was for tax preparation. Nevertheless, we find that Mr. Wakefield's testimony to the prior year's fee provides a factual basis for an allowance of $450. See Vanicek v. Commissioner, 85 T.C. at 742-743 (explaining that the Court may estimate the amount of an allowable deduction where evidence in the record provides a factual basis therefor). Accordingly, petitioners may deduct an additional $150 for tax return preparation for 2002 and for 2003 beyond the $300 that respondent conceded.

We cannot, however, allow any of petitioners' other claimed deductions for professional and legal fees. As noted, petitioners offered no substantiating evidence for 2004. Although their account statements partially substantiate the previous years' reported expenses, those expenses lack any demonstrated nexus to Mr. Wakefield's job as a stockbroker. Mr. Wakefield could not explain what other services, beyond inappropriate tax evasion activities, Kruse Mennillo performed for him, let alone what business purpose they served. With regard to the other service providers, who formed and maintained the business entities, he testified that the business entities were created to reduce his tax liability.

**[*56]** Nothing in the record tends to prove that these professional and legal expenses were either ordinary or necessary; and in any event, section 162 does not permit deductions of payments in furtherance of a tax avoidance scheme. See Muhich v. Commissioner, 77 T.C.M. (CCH) at 2150. These payments are likewise nondeductible under section 212. See, e.g., Hart v. Commissioner, 338 F.2d 410, 411 (2d Cir. 1964), aff'g per curiam 41 T.C. 131 (1963); Lewis v. Commissioner, 328 F.2d 634, 639 (7th Cir. 1964), aff'g T.C. Memo. 1962-306. Consequently, petitioners may not deduct any of these legal or professional fees.

### 7. Promotions, Meetings, and Seminars

WBE deducted $12,573 in expenses for promotions and meetings for 2002 and $7,544 in expenses for promotions and seminars for 2004. Mr. Wakefield's expense summaries reflect that he spent, cumulatively, thousands of dollars in 2002 through 2004 at the Huntington Beach Waterfront Hilton (Hilton), on promotional pens, Christmas gift baskets for clients, and other client gifts.

### a. Seminars and Pens

Mr. Wakefield testified that he hosted seminars for clients and prospective or potential clients three to four times each year at the Hilton. At these seminars he would discuss subjects such as how a presidential election might affect the stock market or what economic trends to expect for the coming year, pay for

[*57] attendees' meals and parking, and collect their contact information for postseminar followup. He also distributed customized pens imprinted with his name and contact details to seminar attendees. Mr. Wakefield secured new clients through the seminars.

Respondent has conceded that petitioners may deduct $350.28 for 2002 and $541.88 for 2004 for promotional pens.[27] Respondent has further conceded that petitioners may deduct seminar-related expenses of $9,180.97 for 2002, $2,411.92 for 2003, and $3,852 for 2004. Petitioners' 2002 and 2003 account statements reflect numerous charges to the Hilton in excess of the amounts respondent conceded. Assuming, for the moment, that petitioners' evidence demonstrates that their seminar expenditures were ordinary and necessary expenses of Mr. Wakefield's employment as a stockbroker, we cannot ascertain from that evidence which of the Hilton charges relate to the seminars. The numbers on petitioners' account statements do not match those on Mr. Wakefield's handwritten summaries, which do not align with WBE's returns or with the amounts petitioners cite in their posttrial brief. Without any reasonable basis to estimate the true amounts of petitioners' seminar expenditures, we decline to find that they may

---

[27]Petitioners do not seek to deduct expenses for pens in excess of these amounts.

[*58] deduct these expenditures, for any year, in any amounts greater than those respondent conceded. See Vanicek v. Commissioner, 85 T.C. at 742-743.

b. Gifts

Mr. Wakefield testified that in 2002 he purchased Christmas gift baskets costing approximately $65 each from a business called Wine Country for his top 10 clients. His Prudential Financial credit card statement substantiates a $635.70 payment to Wine Country Gift Baskets. When asked about the amount he spent in 2003, Mr. Wakefield estimated that he had given gift baskets to the top 20 clients that year. Three entries on his 2003 Wachovia bank statement substantiate a total expense of $1,436.11.

Like travel, M&E, and automobile expenses, expenditures on gifts must meet the heightened standard of section 274(d). In particular, the taxpayer claiming a deduction must offer evidence to substantiate, for each gift, its cost, date, description, and business purpose, as well the taxpayer's business relationship to the recipient. Sec. 1.274-5T(b)(5), Temporary Income Tax Regs., 50 Fed. Reg. 46016 (Nov. 6, 1985).

No evidence in the record confirms that petitioners actually paid for gift baskets in 2004. For 2002 and 2003 petitioners' evidence of their per-unit cost, description, and business purpose derives from their bank statements and Mr.

[*59] Wakefield's testimony. The Court finds Mr. Wakefield's testimony on these subjects credible, although he plainly stated from memory the baskets' unit price and the number of clients to whom he sent them. Nevertheless, his memory, when sales tax is added, is consistent with the numbers on his account statements. With respect to the dates of delivery and the recipients' relationships to him, Mr. Wakefield spoke generally of sending the baskets to his top clients at "Christmas". Mr. Wakefield's testimony, records of his top clients, and the account statements suffice to substantiate these expenses as required by section 274(d). However, because section 274(b) limits petitioners' annual gift deduction to $25 per recipient, the allowable amounts are $250 for 2002 and $500 for 2003.[28]

### 8. Parking

WBE deducted $1,109 in parking expenses for 2002. Mr. Wakefield's expense summaries reflect that he paid for "office parking" in 2002, "car parking" in 2003, and "parking fees" in 2004. Petitioners' account statements document payments to Ace Parking at least once during each tax year at issue. In his testimony Mr. Wakefield explained that he paid a monthly fee to park his car in the lot next to his office.

---

[28]Mr. Wakefield testified that the promotional pens he distributed to seminar attendees cost less than $4 each, so they do not count toward the $25 limit. See sec. 274(b)(1)(A).

**[\*60]** The cost of parking at one's workplace, like other ordinary commuting expenses, is a personal expense that may not be deducted. <u>Meiers v. Commissioner</u>, T.C. Memo. 1982-51, 43 T.C.M. (CCH) 454, 455-456 (1982); <u>see also</u> sec. 262(a); <u>Neal v. Commissioner</u>, 681 F.2d at 1158. Petitioners may not deduct any of Mr. Wakefield's parking expenses.

### 9. Telephone and Internet Services

WBE deducted $1,028 of telephone service expenses and $77 of Internet service expenses for 2002 and a total of $1,354 for 2004. Mr. Wakefield's expense summaries for 2002 through 2004 reflect payments for Palm Pilot and AOL Internet services as well as payments to three telephone service providers, including AT&T Wireless.[29] Petitioners' account statements reflect numerous payments to telephone and Internet service providers.

With respect to telephone service, Mr. Wakefield testified that he made "a number" of calls from home but could not elaborate on how often or to whom he made these calls. He explained that the numbers on his expense summaries reflected his total phone bills. With respect to Internet service, Mr. Wakefield

---

[29]Mobile telephones qualified as listed property subject to sec. 274(d)'s strict substantiation requirements during the years at issue. <u>See</u> sec. 280F(d)(4). Because petitioners have failed, as a threshold matter, to establish a nexus between Mr. Wakefield's telephone and Internet expenses and his business, we need not discuss these requirements.

**[\*61]** could not describe the purpose of the Palm Pilot service charges and offered no explanation for the AOL charges.

While the record amply documents that petitioners incurred expenses for telephone service and Internet service, no credible evidence links these expenses with Mr. Wakefield's employment as a stockbroker. Even assuming that some of the calls Mr. Wakefield made were to clients or otherwise for business, section 262 prohibits petitioners from deducting the costs of their personal calls, and petitioners have offered no evidence other than Mr. Wakefield's testimony that he "made a number of business calls from home" from which the Court could reasonably estimate the portions of their telephone bills attributable to business. Hence, petitioners' claimed telephone and Internet expense deductions must be disallowed in their entirety. See Vanicek v. Commissioner, 85 T.C. at 742-743.

10. Marketing

WBE deducted $6,302 of marketing expenses for 2002. Mr. Wakefield's expense summary for that year lists expenditures totaling $10,275 for services from Bill Good Marketing, Comp View, Carleton Sheets Marketing, H.S. Dent, and CIS Marketing; his 2004 summary lists only a $2,000 expense for Brian Tracy Business Clinic. Because for 2002 respondent has conceded that payments to Bill Good, H.S. Dent, and CIS Marketing totaling $9,431.96 were all ordinary and

[*62] necessary business expenses,[30] we consider only the Comp View, Carleton Sheets, and Brian Tracy expenses.

Petitioners' account statements document payments totaling $602 to Comp View in 2002. At trial, however, Mr. Wakefield could offer no specific information about his purchase from Comp View. Under cross-examination, when confronted with evidence that the company sold and installed audio and video equipment, he retreated from his initial generalization that the expense must have been for "typical learning seminars for me, subscription things for me for my business." Given Mr. Wakefield's lack of certainty and memory concerning what he bought from Comp View, we find that petitioners have not presented credible evidence that his Comp View purchase served a business purpose. Accordingly, petitioners may not deduct that expense.

---

[30]Except with respect to H.S. Dent, the amount of respondent's concession equals or exceeds the corresponding amount on Mr. Wakefield's handwritten summary. For H.S. Dent, although Mr. Wakefield's summary reflects payments of $282 and $269, totaling $551, respondent conceded only $532. The difference apparently arises from the parties' disparate reading of a blurred digit on Mr. Wakefield's credit card statement: Mr. Wakefield read the amount of his January 4, 2002, charge to H.S. Dent as $281.93, whereas respondent reads it as $261.93. Because of the poor quality of the copy, the Court cannot discern whether the digit is a 6 or an 8 and so will leave the amount of respondent's concession undisturbed. Respondent also conceded expenses of $5,973.04 for payments to CIS Marketing for 2003. This concession corresponds to a notation on Mr. Wakefield's 2003 expense summary.

[*63] Turning to the Carleton Sheets expense, in line with Mr. Wakefield's summary, petitioners' account statements document a $224.80 payment. At trial Mr. Wakefield testified that Mr. Sheets is well known in the real estate industry and "had marketing ideas" and that he had paid for tapes that Mr. Sheets produced. Even assuming that these tapes represented an ordinary and necessary expense of Mr. Wakefield's stockbrokerage job, their cost would not increase the allowed deduction. WBE deducted only $6,302 in marketing expenses for 2002, and respondent has already conceded marketing expenses in excess of that amount. See supra note 25.

Lastly, Mr. Wakefield testified, and respondent offered no evidence to contradict, that he spent $2,000 in monthly subscription charges throughout 2004 on educational tapes and disks produced by Brian Tracy Business Clinic. The tapes focused on marketing, client appreciation, and ways to enhance one's business. These instructional tapes represented an ordinary and necessary business expense to Mr. Wakefield. Petitioners' account statements, however, document only one $4.95 payment on May 25, 2004, to Brian Tracy Business Clinic, so their deduction is limited to that amount.[31]

---

[31]No evidence indicates that any entity other than WBE reported any of Mr. Wakefield's claimed expenses for 2004. Hence, although WBE did not classify

(continued...)

**[\*64]** In sum, in addition to the conceded expenses, petitioners may deduct $4.95 of marketing expenses for 2004 under section 162(a).

### 11. Office Expense

WBE deducted $313 in office expenses for 2002. Mr. Wakefield's handwritten expense summary for that year lists expenditures of $306 for office water and $215 at Office Depot. As to the water, Mr. Wakefield testified that because Prudential did not supply coffee facilities or other refreshments for clients, he paid to stock his office with cups and bottled water from Arrowhead or Sparkletts. He described his Office Depot purchase as consisting of "supplies * * * for the computer, et cetera" but did not specifically articulate a business purpose for the purchase or even confirm that the computer in question was a business computer or was at his office.

Although section 162(a) sets a much lower bar than section 274(d), we think Mr. Wakefield's terse description of his Office Depot purchase fails to clear it. His testimony concerning his office water expense, however, demonstrated that it was ordinary and necessary to his stockbrokerage business. See Bruns v. Commissioner, T.C. Memo. 2009-168, 98 T.C.M. (CCH) 30, 32, 36 (2009)

---

[31](...continued)
any expenses as marketing related on its 2004 return, we see no possibility of a double deduction.

[*65] (allowing section 162(a) deduction of expense for candy and coffee supplied to customers visiting taxpayer's home office).  Although Mr. Wakefield's 2002 expense summary lists a total of $306 in payments for office water, petitioners' 2002 account statements document only a total of $235.20 in such payments, all to Sparkletts.  Hence, we conclude that petitioners may deduct $235.20 in office expenses for 2002 under section 162(a).

12.   Contract Labor

WBE deducted $3,436 in contract labor expenses for 2002.  On his expense summary for that year Mr. Wakefield listed payments totaling $5,727 to "employee" Chris Schilling.  At trial he explained that Mr. Schilling was a recent college graduate and a registered broker whom Mr. Wakefield had hired to assist with his brokerage business.  Mr. Schilling's responsibilities included "prospecting", sending mailers, soliciting clients via telephone, and obtaining signatures from clients.  Mr. Wakefield paid Mr. Schilling on an hourly basis, usually for eight-hour days, three to four times per week.  Mr. Wakefield further testified that he issued Mr. Schilling "a 1099 because I had to pay him out of pocket", but no Form 1099-MISC, Miscellaneous Income, was stipulated or introduced into evidence.

[*66] On the basis of Mr. Wakefield's testimony, we find that Mr. Schilling's wages were an ordinary and necessary expense of Mr. Wakefield's stockbrokerage business. However, petitioners' account statements substantiate only three payments to Mr. Schilling, totaling $2,604.85. These payments tie in with the first three items on Mr. Wakefield's expense summary, but no charges on petitioners' statements document the remaining five payments listed on the summary.[32] Accordingly, petitioners may deduct no more than $2,604.85 in contract labor expenses for 2002 under section 162(a) because of lack of substantiation that additional payments were made.

D.    Summary

We hold that respondent properly disallowed all of petitioners' deductions for passthrough losses from WBE for tax years 2002 through 2004. Pursuant to the parties' agreement, however, we have examined WBE's deductions as if petitioners had claimed them directly on their individual tax returns. In addition to the conceded expenses, subject to the limitations of sections 67 and 68, petitioners

---

[32]Petitioners' checking account statement reflects that Mr. Wakefield wrote two checks to "Chris Schilling", on April 4 and July 8, 2002, in amounts corresponding precisely to the first two payments noted on his summary. The statement lists a third check, payable to "C S" and written on May 2, 2002, in an amount corresponding precisely to the third payment on Mr. Wakefield's summary.

[*67] may properly deduct the following expenses as unreimbursable business expenses under section 162, or with respect to tax preparation fees, expenses of producing income under section 212:

| Category | 2002 | 2003 | 2004 |
|---|---|---|---|
| Admin. fee | --- | --- | --- |
| Travel | --- | --- | --- |
| M&E | --- | --- | --- |
| Automobile | --- | --- | --- |
| Dues & publ'ns | $193.00 | $542.00 | --- |
| Legal & prof'l fees (tax prep.) | 150.00 | 150.00 | --- |
| Promotions, mtgs. & seminars | 250.00 | 500.00 | --- |
| Parking | --- | --- | --- |
| Telephone & Internet servs. | --- | --- | --- |
| Marketing | --- | --- | $4.95 |
| Office expense | 235.20 | --- | --- |
| Contract labor | 2,604.85 | --- | --- |

[*68] IV.    Liability for Penalties

We move now to the final issue presented for decision, namely, whether petitioners are liable for accuracy-related penalties pursuant to section 6662(a) for tax years 2002, 2003, and 2004 with respect to any deficiencies resulting from the disallowance of deductions for passthrough losses from WBE, to the extent petitioners may not directly deduct the expenses underlying those losses.

A.    Applicable Law

Section 6662(a) imposes an accuracy-related penalty of 20% of any underpayment that is attributable to specified causes. Respondent bears the burden of production with respect to petitioners' liability for this penalty. See sec. 7491(c). More specifically, respondent "must come forward with sufficient evidence indicating that it is appropriate to impose the relevant penalty." See Higbee v. Commissioner, 116 T.C. 438, 446 (2001). Once respondent has met his burden of production, the burden shifts to petitioners to prove an affirmative defense or that they are otherwise not liable for the penalty. See id. at 446-447.

Respondent asserts two justifications for imposition of the penalty on petitioners: negligence and a substantial understatement of income tax for each year. See sec. 6662(b)(1) and (2). Negligence "includes any failure to make a reasonable attempt to comply with the provisions of * * * [the Internal Revenue

[*69] Code]". Sec. 6662(c). It constitutes "'a lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances.'" Freytag v. Commissioner, 89 T.C. 849, 887 (1987) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), aff'g on this issue 43 T.C. 168 (1964) and T.C. Memo. 1964-299), aff'd, 904 F.2d 1011 (5th Cir. 1990), aff'd, 501 U.S. 868 (1991). "'Negligence' also includes any failure by the taxpayer to keep adequate books and records or to substantiate items properly." Sec. 1.6662-3(b)(1), Income Tax Regs. A substantial understatement of income tax, as to an individual, is an understatement that exceeds the greater of $5,000 or 10% of the tax required to be shown on the return. Sec. 6662(d)(1)(A).

B.    Petitioners' Liability

Whether any substantial understatement exists, and if so, in what amount, will depend upon the recalculation of petitioners' tax liability for each year in light of the SOSI, the parties' other concessions, and the holdings reached in this opinion. We leave these calculations to the parties under Rule 155. To the extent substantial understatements within the meaning of section 6662(d)(1)(A) exist with respect to the tax stated on their 2002, 2003, and 2004 returns, petitioners are liable for the 20% penalty under section 6662(a) with respect to the portion of

[*70] each understatement attributable to the disallowance of deductions for passthrough losses from WBE.

Regardless of whether any substantial understatement is present, however, petitioners are liable for the negligence penalty under section 6662(b)(1). To avoid this penalty, petitioners needed do no more than (1) reasonably attempt to comply with the tax law, and (2) keep adequate records and substantiate items properly pursuant to section 1.6662-(3)(b)(1), Income Tax Regs. They did neither of these things.

First, petitioners failed to exercise due care and to act with reasonable prudence. See Freytag v. Commissioner, 89 T.C. at 887. They engaged first Grant Thornton, and later Kruse Mennillo, to create and maintain multiple business entities. As the tax matters partner, shareholder and/or officer of these business entities, Mr. Wakefield should reasonably have known that WBE, if not all three business entities, engaged in no business or other activity. WBE existed only on paper--that is, on its tax returns. Mr. Wakefield, who professes to have understood only that WBE served to reduce his tax liability, signed these returns year after year, apparently without inquiry or objection.

Moreover, Mr. Wakefield provided his accountants with annual expense summaries on which he casually mixed business and personal expenses. He used

[*71] the same accounts for personal and business expenses, then reported all food and beverage charges on those accounts for the entire year as business related. Because he used his personal automobile for business, he sought to deduct all expenses associated with the vehicle, notwithstanding its dual function. And because he made business calls from home, he attempted to deduct his personal phone bills in their entirety. As we have repeatedly emphasized: "[A]ttempt[s] to deduct personal expenses in contravention of the plain language of section 262 constitute[] negligence." Bond v. Commissioner, T.C. Memo. 2012-313, at *13-*14 (fn. ref. omitted); accord, e.g., Cor v. Commissioner, T.C. Memo. 2013-240, at *8; WSB Liquidating Corp. v. Commissioner, T.C. Memo. 2001-9, 81 T.C.M. (CCH) 1007, 1012 (2001).

Second, we have described at length how petitioners failed to maintain adequate records and substantiate their tax items. They contend, in substance, that Mr. Wakefield kept meticulous diaries fully substantiating all of their reported expenses, that he unwittingly discarded these diaries, and that they should be held to a lower standard as a result. Yet Mr. Wakefield made no attempt to reconstruct the diaries. See sec. 1.274-5T(c)(5), Temporary Income Tax Regs., supra (permitting taxpayer to reconstruct substantiating records when originals are destroyed by forces beyond taxpayer's control). Instead, he offered highly general

[*72] testimony, and in some cases, presented no evidence, either testimonial or documentary, to substantiate claimed expenses. See Malinowski v. Commissioner, 71 T.C. at 1124-1125 (noting that where section 274 does not apply, taxpayer may offer other credible evidence in lieu of substantiating records). Moreover, Mr. Wakefield's testimony reflects that he discarded his diaries for the years at issue after receiving a notice of deficiency and petitioning this Court. See sec. 1.6001-1(e), Income Tax Regs. (providing that records must be retained as long as they may be material in administration of the tax law).

Hence, even if the Rule 155 calculation does not reveal a substantial understatement within the meaning of section 6662(d)(1)(A), petitioners were negligent. Either way, they are liable for the section 6662(a) accuracy-related penalty as to any underpayment with respect to respondent's disallowance of a deduction for passthrough losses from WBE for each tax year at issue.

C.    Petitioners' Defenses

As an affirmative defense to the substantial understatement and negligence penalties, petitioners contend that they had reasonable cause for the positions taken on their returns, and that they acted in good faith.[33] See sec. 6664(c).

_____

[33]Petitioners raise two additional defenses: (1) substantial authority and (2) reasonable basis and adequate disclosure. See sec. 6662(d)(2)(B). As these

(continued...)

[*73] Petitioners plead that they relied completely and without question upon their "expert accountants" at Grant Thornton and Kruse Mennillo. They allege that they were essentially bamboozled and defrauded by these accountants into purchasing a complex tax-deferral scheme that they never understood, and that because they continued to provide expense information in the same manner as before, they had no reason to question the accountants' decisions.

We determine "whether a taxpayer acted with reasonable cause and in good faith * * * on a case-by-case basis, taking into account all pertinent facts and circumstances", including "the taxpayer's education, sophistication and business

---

[33](...continued)
defenses do not explicitly apply to the negligence penalty and would thus not absolve petitioners from that penalty, we do not analyze them at length. With regard to both, however, we note that petitioners have pointed to no authority for their deduction of passthrough losses from a sham partnership or of inadequately substantiated unreimbursable business expenses. Cf. sec. 1.6662-4(d)(3)(i), Income Tax Regs. (providing that substantial authority for an item's tax treatment exists when "the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary treatment"); sec. 1.6662-3(b)(3), Income Tax Regs. (providing that reasonable basis for an item's tax treatment exists when the treatment is "reasonably based on one or more of the authorities" weighed in testing for substantial authority and is more than merely arguable or colorable). Petitioners' bare assertions of substantial authority and reasonable basis would not suffice. Moreover, given their lack of substantiation, adequate disclosure would be of little help. See sec. 1.6662-4(e)(2)(iii), Income Tax Regs. (providing that otherwise adequate disclosure is irrelevant where item or return position "[i]s not properly substantiated, or the taxpayer failed to keep adequate books and records with respect to the item or position"). Accordingly, petitioners have not established either of their two additional defenses.

[*74] experience". Sec. 1.6664-4(b)(1), (c)(1), Income Tax Regs.[34] Reliance on

professional advice will absolve the taxpayer only if "such reliance was reasonable

and the taxpayer acted in good faith." Id. para. (b)(1).

Good-faith reliance on professional advice is not a silver bullet. See

Freytag v. Commissioner, 89 T.C. at 888; LaPlante v. Commissioner, T.C. Memo.

2009-226, 98 T.C.M. (CCH) 305, 310 (2009). "The advice must be from

competent and independent parties, not from the promoters of the investment" or

advisers who have a conflict of interest. Swanson v. Commissioner, T.C. Memo.

2009-31, 97 T.C.M. (CCH) 1127, 1129 (2009) (citing LaVerne v. Commissioner,

94 T.C. 637, 652-653 (1990), aff'd without published opinion, 956 F.2d 274 (9th

Cir. 1992)); see Hansen v. Commissioner, 471 F.3d 1021, 1031 (9th Cir. 2006),

aff'g T.C. Memo. 2004-269. "Courts have repeatedly held that it is unreasonable

for a taxpayer to rely on a tax adviser actively involved in planning the transaction

[34]The regulations under sec. 6664(c) did not specifically reference a "taxpayer's education, sophistication and business experience" as circumstances pertinent to the reasonable cause analysis until December 30, 2003. See T.D. 9109, 2004-1 C.B. 519, 522. Before that date, however, our decisions similarly identified "[t]he taxpayer's mental and physical condition, as well as sophistication with respect to the tax laws, at the time the return was filed", as factors relevant to determining reasonable cause. See, e.g., Kees v. Commissioner, T.C. Memo. 1999-41, 77 T.C.M. (CCH) 1374, 1378 (1999); Ruckman v. Commissioner, T.C. Memo. 1998-83, 75 T.C.M. (CCH) 1880, 1886 (1998); Escrow Connection, Inc. v. Commissioner, T.C. Memo. 1997-17, 73 T.C.M. (CCH) 1705, 1714 (1997).

**[*75]** and tainted by an inherent conflict of interest." <u>Canal Corp. v. Commissioner</u>, 135 T.C. 199, 218 (2010); <u>LaVerne v. Commissioner</u>, 94 T.C. at 652-653.

Mr. Wakefield testified that Mr. Stover pitched him on the multientity structure that petitioners ultimately purchased. Petitioners have emphasized their reliance on Mr. Stover's expertise and that of Angela Parker and Kelly Webb, whom Mr. Stover brought with him from Grant Thornton to Kruse Mennillo and who prepared petitioners' tax returns for 2002 through 2004. But the advice petitioners received from these individuals was tainted. Mr. Stover designed and marketed the structure, and he, Ms. Parker, and Ms. Webb shared a financial interest in providing services to the sham business entities they created for petitioners.

Mr. Wakefield emphasized that he trusted Mr. Stover's representations concerning the business entities because Grant Thornton was a "Big 8 firm." He nevertheless did not hesitate to follow Mr. Stover and his team to Kruse Mennillo. Mr. Wakefield admitted that he did not understand what purpose the business entities served other than reducing his tax liability, but the record does not reflect that he ever sought independent tax advice. <u>See</u> <u>Hansen v. Commissioner</u>, 471 F.3d at 1031 (affirming negligence penalty where taxpayers relied solely on

[*76] transaction's promoters and did not independently verify their tax returns); see also LaVerne v. Commissioner, 94 T.C. at 652 (affirming negligence penalty against taxpayers who failed to seek independent advice, and against taxpayer who did seek independent advice, where investment venture on its face would "have raised serious questions in the minds of ordinarily prudent investors").

Mr. Wakefield was the sole witness to testify at trial. His self-serving testimony will not, alone, establish reasonable cause. "[W]e have found reliance to be unreasonable where a taxpayer claimed to have relied upon an independent adviser because the adviser either did not testify or testified too vaguely to convince us that the taxpayer was reasonable in relying on the adviser's advice". Swanson v. Commissioner, 97 T.C.M. (CCH) at 1130; see also Heller v. Commissioner, T.C. Memo. 2008-232, 96 T.C.M. (CCH) 241, 244 (2008) (upholding penalty where, aside from the taxpayer's "self-serving testimony, there * * * [was] no evidence in the record as to the specific nature of * * * [the professional's] advice"), aff'd, 403 Fed. Appx. 152 (9th Cir. 2010).

Mr. Wakefield should have realized that something was amiss. See LaVerne v. Commissioner, 94 T.C. at 652-653. He not only has a college education but also attended two years of law school. As of 2002 he had 30 years of experience in the securities industry, and his job consisted of providing

**[\*77]** financial advice to others. Yet he executed tax returns as president and tax matters partner of companies he professes to have known nothing about. We find implausible Mr. Wakefield's assertion that he signed on the dotted line year after year without even glancing at the returns' contents. Had he done so, he would have seen that they reported economic activity about which he was, he claims, wholly ignorant. Under all the circumstances, Mr. Wakefield's claims that he unquestioningly trusted his expert accountants are simply not credible. His testimony demonstrated, at best, calculated blindness, not reasonable reliance.[35]

---

[35]For a taxpayer to rely reasonably upon advice, "the taxpayer must prove * * * that the taxpayer meets each requirement of the following three-prong test: (1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002); see also Charlotte's Office Boutique, Inc. v. Commissioner, 425 F.3d 1203, 1212 & n.8 (9th Cir. 2005) (quoting three-prong test in Neonatology Assocs. with approval), aff'g 121 T.C. 89 (2003), supplemented by T.C. Memo. 2004-43. Beyond citing the names of the firms and characterizing the individuals with whom he dealt as "CPAs", Mr. Wakefield offered no information about his advisers' credentials or experience, and petitioners introduced no other evidence concerning their advisers' qualifications despite the obvious conflicts of interest. Hence, they failed to satisfy the first of the three prongs. They likewise fail the third prong. As we have explained, Mr. Stover and his colleagues devised the deferral scheme at issue and sold it to petitioners. See supra p. 75. "[P]romoters take the good-faith out of good-faith reliance." 106 Ltd. v. Commissioner, 136 T.C. 67, 79 (2011), aff'd, 684 F.3d 84 (D.C. Cir. 2012); accord Paschall v. Commissioner, 137 T.C. at 22-23; Canal Corp. v. Commissioner, 135 T.C. 199, 218 (2010).

**[*78]** Accordingly, petitioners have not met their burden of proof with respect to the reasonable cause defense to the section 6662(a) penalties.  Because they likewise failed to adequately prove their other defenses, the 20% penalty will apply to any deficiencies resulting from the disallowance of deductions for passthrough losses from WBE, to the extent that petitioners may not deduct the expenses underlying those losses directly, pursuant to respondent's concessions or this opinion.

The Court has considered all of petitioners' contentions, arguments, requests, and statements.  To the extent not discussed herein, we conclude that they are meritless, moot, or irrelevant.

To reflect the foregoing,

<u>Decision will be entered under</u>

<u>Rule 155</u>.